UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

T.S.,                                                    Case No. 23-CV-2530 (PJS/ECW)

            Plaintiff,

v.                                                              ORDER

WYNDHAM HOTELS & RESORTS, INC.,
f/k/a Wyndham Worldwide Corporation,
d/b/a Super 8; SARAH HOSPITALITY,
INC., d/b/a Super 8 Brooklyn Center;
WYNDHAM HOTEL GROUP, LLC; and
SUPER 8 WORLDWIDE, INC.,

            Defendants.

        Bryan O. Blevins, PROVOST & UMPHREY, for plaintiff.

        David S. Sager, DLA PIPER LLP (US), for defendants Wyndham Hotels &
        Resorts, Inc., Wyndham Hotel Group, LLC, and Super 8 Worldwide, Inc.

        Plaintiff T.S. is a sex-trafficking victim who, as a minor, was forced to engage in

commercial sex acts at the Super 8 Hotel in Brooklyn Center, Minnesota ("the Brooklyn

Center Super 8").  At the time, the Brooklyn Center Super 8 was owned and operated by

defendant Sarah Hospitality, Inc. ("SHI").  SHI was a franchisee of defendants

Wyndham Hotels & Resorts, Inc., Wyndham Hotel Group, LLC, and Super 8

Worldwide, Inc. (collectively, "Wyndham").  In this action, T.S. seeks to hold SHI and

Wyndham liable for her injuries under the Trafficking Victims Protection

Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595, and Masha's Law, 18 U.S.C. § 2255.

This matter is before the Court on Wyndham's motion to dismiss T.S.'s claims against it pursuant to Fed. R. Civ. P. 12(b)(6).  ECF No. 34.  T.S. and Wyndham agree that Wyndham's motion turns on the meaning of the TVPRA, but they—like courts around the country—have offered sharply different interpretations of that statute.  For the reasons that follow, the Court finds that T.S. has pleaded plausible claims against Wyndham, and therefore denies Wyndham's motion to dismiss.

## I.  BACKGROUND

T.S. alleges that, at the age of 15, she was forced by sex traffickers to engage in commercial sex acts.  *See* Am. Compl. ¶ 22.  T.S. further alleges that, between August 2013 and December 2013, her traffickers repeatedly forced her to engage in commercial sex acts at the Brooklyn Center Super 8.  As noted, the Brooklyn Center Super 8 was owned and operated by SHI pursuant to a franchise agreement with Wyndham.  *See* Am. Compl. ¶¶ 21, 23.  T.S. has alleged that two different organizations were involved in trafficking her:  the traffickers (i.e., pimps) who actually forced her to engage in commercial sex acts (referred to as "Venture 1"), Am. Compl. ¶ 110, and the Brooklyn Center Super 8 (i.e., the hotel) that rented rooms to the sex traffickers (referred to as "Venture 2"), Am. Compl. ¶ 117.

According to T.S., the staff at the Brooklyn Center Super 8 were aware that she was being trafficked and that she was a minor.  *See* Am. Compl. ¶¶ 76–79.  T.S.

specifically alleges that, when her traffickers rented a room at the Brooklyn Center Super 8 in September 2013, the hotel's record of that reservation noted that a minor was staying in the room and that prostitution was likely taking place in the room. Am. Compl. ¶ 80–81. T.S. also alleges that hotel staff were familiar with her traffickers and provided accommodations beyond those provided to typical lodgers, such as extra housekeeping services and an "excessive" number of towels "to clean the activities of the trafficking venture." *See* Am. Compl. ¶ 114. As T.S. tells it, her traffickers openly engaged in sex trafficking at the Brooklyn Center Super 8 with the knowledge and tacit permission of the hotel's staff. *See* Am. Compl. ¶¶ 30, 62–63.

T.S. pleads a number of reasons why Wyndham, the franchisor of Super 8 hotels, must have known about the sex trafficking taking place at the Brooklyn Center Super 8. T.S. alleges that Wyndham was aware that sex trafficking was prevalent in the hotel industry generally, *see* Am. Compl. ¶¶ 31–45, and at Super 8 hotels specifically. *See* Am. Compl. ¶¶ 48–49, 52. T.S. further alleges that Wyndham knew that sex trafficking was prevalent at the Brooklyn Center Super 8, both because the hotel was in a high-crime area near where two men had been arrested for sex trafficking in 2012 (the year before T.S. was trafficked), *see* Am. Compl. ¶ 59–60, and because Wyndham had access to online reviews in which guests of the hotel complained of crime and prostitution, *see* Am. Compl. ¶ 61. T.S. further alleges that Wyndham required SHI, as its franchisee, to

report suspected instances of crime (including sex trafficking), and that Wyndham retained extensive inspection and monitoring rights that (if exercised) would have revealed the existence of sex trafficking at the Brooklyn Center Super 8.  *See* Am. Compl. ¶¶ 66–74.

Critical to T.S.'s claims against Wyndham is her allegation that the franchise agreement between SHI and Wyndham gave Wyndham so much control over the Brooklyn Center Super 8 that SHI functioned as Wyndham's agent.  *See* Am. Compl. ¶ 132–36.  For example, T.S. alleges that Wyndham maintained day-to-day control over the rental of rooms at the Brooklyn Center Super 8 by requiring SHI to use Wyndham's centralized reservation system and software, by reserving rooms and accepting payment without involvement from SHI, by restricting the ability of SHI to refuse or cancel reservations, by controlling the price of rooms, by setting payment and identification procedures for check-in, by requiring SHI to implement Wyndham's customer-loyalty program, and by maintaining ownership of all customer data.  *See* Am. Compl. ¶ 100.  T.S. alleges that, because Wyndham controlled the reservation system at the Brooklyn Center Super 8, Wyndham had direct contact with her traffickers when they booked the rooms in which they trafficked her.  *See* Am. Compl. ¶ 113.

T.S. contends that Wyndham exercised control over operations at the Brooklyn Center Super 8 in other ways, including by directing staff to undergo mandatory training on hotel operations and detection of sex trafficking, auditing the hotel's books and conducting unscheduled inspections, retaining the right to impose fines and take other corrective actions in response to violations of the franchise agreement, setting staffing levels for the hotel, setting pay ranges and job descriptions for hotel employees, providing benefits to hotel employees, making hiring decisions, and maintaining employment records. *See* Am. Compl. ¶¶ 103, 135, 139. Based on these allegations, T.S. alleges that SHI acted as Wyndham's agent in operating the Brooklyn Center Super 8. *See* Am. Compl. ¶¶ 137–139.

In her amended complaint, T.S. brings four claims against SHI and Wyndham: In Count 1, she seeks to hold SHI liable under the TVPRA (18 U.S.C. § 1595) for directly perpetrating a criminal violation of 18 U.S.C. § 1591(a) against her. In Count 2, she seeks to hold both SHI and Wyndham liable under the TVPRA as beneficiaries of the sex-trafficking crimes committed against her. In Count 3, she seeks to hold SHI and Wyndham liable under Masha's Law (18 U.S.C. § 2255), again as beneficiaries of the crimes committed against her. And in Count 4, she seeks to hold Wyndham vicariously liable for SHI's violations of § 1591(a).

Wyndham has now moved to dismiss T.S.'s claims against it.

## II. ANALYSIS

### A.  Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *See Du Bois v. Bd. of Regents*, 987 F.3d 1199, 1202 (8th Cir. 2021).

### B.  Claims Against Wyndham

Each of T.S.'s claims against Wyndham is predicated on an underlying violation of 18 U.S.C. § 1591(a).  That statute imposes criminal penalties on anyone who knowingly:

> (1)    in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2)    benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

> knowing, or . . . in reckless disregard of the fact, that means
> of force, threats of force, fraud, [or] coercion described in
> subsection (e)(2), or any combination of such means will be
> used to cause the person to engage in a commercial sex act,
> or that the person has not attained the age of 18 years and
> will be caused to engage in a commercial sex act . . . .

The statute defines a "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity," *id.* § 1591(e)(6), and the statute defines "participation in a venture" to mean "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)," *id.* § 1591(e)(4).

A victim of a violation of § 1591(a) has civil remedies available to her. As relevant here, the TVPRA, 18 U.S.C. § 1595, provides that:

> An individual who is a victim of a violation of [§ 1591(a)]
> may bring a civil action against the perpetrator (or whoever
> knowingly benefits, or attempts or conspires to benefit,
> financially or by receiving anything of value from
> participation in a venture which that person knew or should
> have known has engaged in an act in violation of this
> chapter) in an appropriate district court of the United States
> and may recover damages and reasonable attorney[']s fees.

In essence, § 1595 allows a sex-trafficking victim to seek damages from the direct perpetrator of the sex trafficking and any non-perpetrators who benefitted from the sex trafficking.

A victim of sex trafficking in violation of § 1591(a) can also bring a civil action under Masha's Law, 18 U.S.C. § 2255, which provides:

-7-

> Any person who, while a minor, was a victim of a violation
> of section . . . 1591 . . . of this title and who suffers personal
> injury as a result of such violation, regardless of whether the
> injury occurred while such person was a minor, may sue in
> any appropriate United States District Court and shall
> recover the actual damages such person sustains or
> liquidated damages in the amount of $150,000, and the cost
> of the action, including reasonable attorney's fees and other
> litigation costs reasonably incurred.  The court may also
> award punitive damages and such other preliminary and
> equitable relief as the court determines to be appropriate.

Unfortunately, the drafting of these statutes is as bad as their underlying motivation is good.  For example, Masha's Law does not say *whom* a plaintiff may sue, and it is not clear if Masha's Law creates an independent cause of action or simply modifies the relief available under the TVPRA (and other statutes).  The Court need not address those precise issues, however, as the parties agreed at oral argument that, for purposes of ruling on Wyndham's motion, the Court may treat the TVPRA claims and the Masha's Law claims as coextensive.  Accordingly, the Court will focus on the merits of T.S.'s § 1595 claims as pleaded in Counts 2 and 4 of the amended complaint, turning first to the vicarious-liability claim.

### 1.  Vicarious Liability (Count 4)

"It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment."  *Meyer v. Holley*, 537 U.S. 280, 285 (2003).  In

Count 4 of the amended complaint, T.S. seeks to hold Wyndham vicariously liable for SHI's alleged violations of § 1591(a), on the theory that SHI was Wyndham's agent and acted within the scope of that agency when it perpetrated or benefitted from the sex trafficking of T.S.

At the outset, Wyndham argues that Count 4 must be dismissed because § 1595 does not allow for any type of vicarious liability.  As T.S. points out, however, "numerous district courts have rejected" Wyndham's argument.  *J.L. v. Best Western Int'l, Inc.*, 521 F. Supp. 3d 1048, 1064 (D. Colo. 2021) (collecting cases).  Wyndham is correct that § 1595 does not expressly impose vicarious liability, but Wyndham ignores that "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules."  *Meyer*, 537 U.S. at 285.  "[S]uch background legal principles apply unless the statute's text or context indicate otherwise."  *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 961 (8th Cir. 2019) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011)).  Nothing in the text of § 1595 indicates that Congress meant to preclude the application

of "ordinary tort-related vicarious liability rules,"[1] *Meyer*, 537 U.S. at 285, and thus this Court joins in rejecting Wyndham's argument.

Wyndham next argues that, even assuming that § 1595 allows for vicarious liability, T.S. has not pleaded a plausible vicarious-liability claim against it. To plead such a claim, T.S. must plausibly allege (1) that SHI violated § 1591(a); (2) that SHI was Wyndham's agent; and (3) that, in violating § 1591(a), SHI acted within the scope of that agency. *See H.S. v. Red Roof Inns, Inc.*, No. 2:22-cv-3778, 2024 WL 1347393, at *9 (S.D. Ohio Mar. 29, 2024).

Wyndham does not seriously dispute that T.S. has pleaded a plausible § 1595 claim against SHI.[2] That is wise. As explained above, § 1595 authorizes a civil action against the perpetrator of a § 1591(a) offense, and a defendant perpetrates a § 1591(a) offense by knowingly "harbor[ing] . . . by any means a person . . . knowing, or . . . in reckless disregard of the fact . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act . . . ." 18 U.S.C. § 1591(a). T.S. has

---

[1]Wyndham appears to suggest that § 1595 already provides "for a form of secondary liability" by imposing liability on beneficiaries of sex-trafficking violations. *Jean-Charles v. Perlitz*, 937 F. Supp. 2d 276, 287 n.10 (D. Conn. 2013). "But beneficiary liability is not third-party liability. Rather, it is another form of direct liability." *A.D. v. Wyndham Hotels & Resorts, Inc.*, No. 4:19cv120, 2020 WL 9550005, at *3 n.1 (E.D. Va. Sept. 21, 2020).

[2]Wyndham has also not argued that, if SHI was its agent, SHI did not act within the scope of that agency in violating § 1591(a).

alleged (1) that SHI harbored her by providing her with lodging, *see Harboring, Black's Law Dictionary* (11th Ed. 2019) ("The act of affording lodging . . . to a person . . ."); (2) that the hotel staff had a reasonable opportunity to observe her; (3) that it was readily apparent to the hotel staff that she was a minor; (4) that, on at least one occasion, the hotel staff knew that she was staying in a room in which commercial sex acts were occurring; and (5) that the hotel staff intentionally accommodated her sex traffickers by providing them with extra housekeeping services and towels.  These allegations make plausible T.S.'s claim that SHI violated § 1591(a) by harboring her despite knowing or recklessly disregarding that she would be caused to engage in a commercial sex act in a room at the Brooklyn Center Super 8.

The remaining question, then, is whether T.S. has adequately pleaded the existence of an agency relationship between SHI and Wyndham.  "Under an agency theory of liability, a party may be held liable even if he or she does not [directly violate the law] but the direct violator acts as the party's agent."  *Golan*, 930 F.3d at 960–61. "Federal courts look to the Restatement of Agency to determine whether agency liability exists."  *A.D. v. Wyndham Hotels & Resorts, Inc.*, No. 4:19cv120, 2020 WL 9550005, at *3 (E.D. Va. Sept. 21, 2020) (citing *Hodgin v. UTC Fire & Sec. Am. Corp.*, 885 F.3d 243, 252 (4th Cir. 2018)).[3]  Under the Restatement, "[a]n agency relationship exists

_____

[3]Courts have split on whether state or federal law applies to vicarious-liability

(continued...)

-11-

when a principal 'manifests assent' to an agent 'that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'"  *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 659–60 (4th Cir. 2019) (quoting Restatement (Third) of Agency, § 1.01).  Wyndham has not addressed the issue of assent, but instead focuses on the issue of control.

"An essential element of any agency claim is that the asserted principal has the right to control the actions of the asserted agent."  *BE & K Constr. Co. v. United Bhd. of Carpenters & Joiners of Am.*, 90 F.3d 1318, 1326 (8th Cir. 1996) (citations omitted).  What distinguishes a principal-agent relationship from the relationship between the parties to an ordinary contract for services is "the power to give interim instructions."

---

[3](...continued)
claims under the TVPRA.  *Compare, e.g.*, *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 195–96 (E.D. Pa. 2020) (applying Pennsylvania law to vicarious-liability claim), *with J.C. v. Choice Hotels Int'l, Inc.*, 20-cv-00155-WHO, 2020 WL 3035794, at *1 (N.D. Cal. June 5, 2020) (noting that "the TVPRA is silent on the issue of indirect liability, which suggests that the federal common law of agency should apply") (citation omitted).  The Court finds that the latter line of cases is more persuasive and more consistent with Supreme Court precedent.  *See, e.g.*, *Meyer v. Holley*, 537 U.S. 280, 285–86 (2003) (applying "traditional vicarious liability rules" articulated in Restatement of Agency to provision of Fair Housing Act that "says nothing about vicarious liability"); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 755 (1998) (treating Restatement of Agency as "useful beginning point for a discussion of general agency principles" to apply to claims under Title VII of the Civil Rights Act); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989) (relying on "general common law of agency, rather than on the law of any particular State, to give meaning to" terms of Copyright Act of 1976).  And in any event, Minnesota law and federal common law "utilize the same general elements of an agency relationship."  *ResCap Liquidating Tr. v. LendingTree, LLC*, No. 19-CV-2360 (SRN/HB), 2020 WL 1317719, at *19 n.13 (D. Minn. Mar. 20, 2020).

Restatement (Third) of Agency, § 1.01 cmt. f(1).  In a principal-agent relationship, the

principal has the ability to dictate not just *what* its agent must accomplish, but *how* its

agent must go about accomplishing that contractual duty.

In the franchise context,

> courts long have recognized that some degree of control by
> the franchisor over the franchisee would appear to be
> inherent in the franchise relationship, but the mere existence
> of a franchise relationship does not necessarily trigger a
> [principal-agent] relationship.  What matters is the nature
> and extent of such control as defined in the franchise
> agreement or by the actual practice of the parties.

*In re Volkswagen Grp. of Am., Inc.*, 28 F.4th 1203, 1210 (Fed. Cir. 2022) (cleaned up).  Thus,

to plausibly plead that SHI acted as Wyndham's agent, T.S. must allege—in more than a

conclusory way—that Wyndham "exercised control over the means and methods of

daily hotel activities" at the Brooklyn Center Super 8.  *A.B. v. Hilton Worldwide Holdings*

*Inc.*, 484 F. Supp. 3d 921, 940 (D. Or. 2020).  In addition, T.S. must plead that

Wyndham's alleged control "relates to the means and methods (or instrumentality) of

her harm."  *J.C. v. Choice Hotels Int'l, Inc.*, No. 20-cv-00155-WHO, 2020 WL 6318707, at *9

(N.D. Cal. Oct. 28, 2020).[4]

---

[4]It is not clear whether federal common law incorporates this "instrumentality" element.  It does not matter, though, as the Court finds that T.S. has plausibly alleged the existence of this element.

The Court finds that T.S. has plausibly pleaded that SHI acted as Wyndham's agent. T.S. has alleged that she was harmed when her traffickers rented rooms at the Brooklyn Center Super 8 and forced her to engage in commercial sex acts in those rooms. She has also alleged that Wyndham maintained control over a number of facets of the hotel's daily operations that either facilitated or could have prevented her harm. For example, T.S. has alleged that Wyndham reserved rooms and accepted payment (including with respect to her traffickers) without involvement from SHI, that Wyndham restricted the ability of SHI to refuse or cancel a reservation, that Wyndham dictated room pricing, that Wyndham set check-in procedures for payment and identification, that Wyndham directly provided mandatory training to hotel staff on security and detection of sex trafficking, that Wyndham set staffing-level requirements for the hotel, that Wyndham frequently audited SHI's records and conducted unscheduled inspections of the Brooklyn Center Super 8, and that Wyndham had the right to impose a corrective action plan on SHI (or altogether terminate SHI's franchise agreement) if SHI failed to follow Wyndham's rules and expectations regarding the day-to-day operation of the Brooklyn Center Super 8. Taken together, these allegations make plausible T.S.'s claim that SHI acted as Wyndham's agent in operating the Brooklyn Center Super 8.

Wyndham protests that everything T.S. has alleged is true of every franchisor-franchisee relationship in the hotel industry. According to Wyndham, these features are necessary to maintain brand quality and uniformity, which franchisors such as Wyndham must do in order to retain the protection of their trademarks under the Lanham Act.[5]

But this matter is before the Court on a motion to dismiss. The Court has no idea what terms are common in franchisor-franchisee agreements, nor what terms must be included in such agreements if franchisors are not to lose legal protection of their trademarks. Moreover, Wyndham's arguments, even if true, are largely irrelevant. If the control that Wyndham exercised over SHI created a principal-agent relationship, then so be it. It does not matter *why* Wyndham exercised such control, nor does it

---

[5] *See, e.g.*, 15 U.S.C. § 1064 (providing that trademark registration may be cancelled if mark is abandoned); *id.* § 1055 (allowing that use of a trademark by "related companies" shall not affect the validity of the mark); *id.* § 1127 (defining related company as "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used"); *see also Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959) ("Without the requirement of control, the right of a trademark owner to license his mark separately from the business in connection with which it has been used would create the danger that products bearing the same trademark might be of diverse qualities. . . . Clearly the only effective way to protect the public where a trademark is used by licensees is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees.") (citations omitted).

matter whether other franchisors exercised similar levels of control over their franchisees.[6]

For these reasons, the Court denies Wyndham's motion to dismiss Count 4.[7]

### 2.  Direct Liability (Count 2)

In Count 2 of the amended complaint, T.S. seeks to hold Wyndham directly liable under § 1595 for the injuries that she suffered on account of being forced to engage in commercial sex acts at the Brooklyn Center Super 8.  In other words, T.S. claims that, even if Wyndham is not *vicariously* liable for SHI's acts, Wyndham is *directly* liable to T.S. because it benefitted from her being sex trafficked.

_____

[6]The Court recognizes that other courts have dismissed similar vicarious-liability claims at the motion-to-dismiss stage.  But many of those cases are distinguishable, either because the courts applied narrower state-law standards, or because the plaintiffs' factual allegations were not as extensive as T.S.'s.  *See, e.g., S.J. v. Choice Hotels Int'l*, 473 F. Supp. 3d 147, 154–55 (E.D.N.Y. 2020) (applying New York agency law); *J.K. v. Ramada Worldwide, Inc.*, NO. 1:23-CV-108-TWT, 2023 WL 5621913, at *4–5 (N.D. Ga. Aug. 30, 2023) (applying Georgia law); *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 729 (11th Cir. 2021) (affirming dismissal of vicarious-liability claims where complaint contained "mere recitations of the requirements for franchisor liability").

[7]T.S. has also pleaded a claim of joint-employer liability, which appears to be closely related to the agency claim.  T.S.'s attempt to apply the joint-employer doctrine in this context creates difficult legal issues that are best addressed on a full record.  Moreover, leaving the joint-employer claim in the case should not expand the scope of discovery.  Therefore, to the extent that Count 4 is based on a claim that Wyndham is vicariously liable for SHI's acts under the joint-employer doctrine, the Court denies Wyndham's motion to dismiss.

As explained above, in addition to authorizing a sex-trafficking victim to sue the direct perpetrator, § 1595 also creates a cause of action against "whoever knowingly benefits . . . financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of" a federal sex-trafficking law such as § 1591(a).  In *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544 (7th Cir. 2023), the Seventh Circuit summarized the elements of a § 1595 beneficiary claim as follows:  A "plaintiff . . . who is a victim of a criminal violation must allege and ultimately prove that (1) a venture has engaged in an act in violation of Section 1591, (2) the defendant knew or should have known that the venture had violated Section 1591, (3) the defendant participated in that venture, and (4) the defendant knowingly benefitted from its participation."  *Id.* at 553.

Wyndham seems to concede that T.S. has plausibly alleged that a venture has engaged in an act that violated § 1591, but argues that T.S. has failed to plausibly plead any of the other three elements against Wyndham—that is, that Wyndham participated in the venture, that Wyndham knew or should have known that the venture had engaged in an act in violation of § 1591, and that Wyndham knowingly benefitted from its participation in the venture.  T.S. disagrees, and urges this Court to follow *G.G.*'s lead.  In *G.G.*, the Seventh Circuit adopted an extraordinarily broad reading of § 1595, and found that Salesforce (a provider of software to many businesses) could be held

-17-

liable as a beneficiary of sex trafficking because it furnished customized software to Backpage.com (an advertising site used by sex traffickers). *See id.* at 551–65.

The Court now addresses each of the four elements of a § 1595 beneficiary claim.

*a. Venture*

To plead a plausible § 1595 beneficiary claim, T.S. first needs to plead the existence of a venture that "engaged in an act in violation of [§ 1591(a)]." 18 U.S.C. § 1595; *G.G.*, 76 F.4th at 553. Section 1595 does not define the term "venture," but as the Seventh Circuit pointed out, there is no reason to define "venture" for purposes of § 1595 more narrowly than "venture" is defined for purposes of § 1591(a): "any group of two or more individuals associated in fact, whether or not a legal entity." 18 U.S.C. § 1591(e)(6); *see G.G.*, 76 F.4th at 554. The venture in question need not engage solely in sex trafficking; instead, it can be "a business whose primary focus is not on sex trafficking." *G.G.*, 76 F.4th at 554. Nevertheless, the statute is clear that the venture in question must commit a violation of § 1591(a) (or another federal sex-trafficking law).

Here, T.S. alleges the existence of two different ventures that violated § 1591(a). The first ("Venture 1") consists of what might be described as T.S.'s "street-level" traffickers, *id.*—that is, the pimps who forced T.S. to engage in commercial sex acts. The second ("Venture 2") consists of the Brooklyn Center Super 8. Each venture is a group

of two or more individuals associated in fact, and T.S. alleges that both ventures

violated § 1591(a).

That Venture 1 violated § 1591(a) is not in dispute, and the Court has already

held that T.S. has plausibly alleged that Venture 2 violated § 1591(a).  Again, T.S. has

alleged that Venture 2—a/k/a the Brooklyn Center Super 8—provided her with lodging,

knew or should have known that she was under 18, knew that she was staying in a

room where prostitution was occurring, and specifically accommodated her traffickers

by providing them with extra services.  T.S. has thus plausibly pleaded the existence of

two distinct ventures that "engaged in an act in violation of [§ 1591(a)]."  18 U.S.C.

§ 1595.

### b.  Knowledge

Next, T.S must plausibly allege that Wyndham "knew or should have known"

that either Venture 1 or Venture 2 had "engaged in an act in violation of [§ 1591(a)]."  *Id.*

On this point, the parties sharply dispute what the statute requires.  T.S. agrees with the

Seventh Circuit that a plaintiff need allege only "that the defendant had constructive

knowledge that a venture *generally* has violated Section 1591."  *G.G.*, 76 F.4th at 558.

Wyndham, by contrast, agrees with the Eleventh Circuit's decision in *Doe #1 v. Red Roof*

*Inns, Inc.* that a plaintiff must plausibly allege that the defendant had actual or

constructive knowledge that *the plaintiff* was a victim of a violation of § 1591(a).  21 F.4th

-19-

at 725 (stating that defendant must "have either actual or constructive knowledge that the venture . . . violated the TVPRA *as to the plaintiff*" (emphasis added)).

This Court finds both interpretations to be problematic. As *G.G.* explained, the Eleventh Circuit's interpretation of § 1595 "goes two bridges too far," as it would (1) require courts to interpret "'*an* act' of sex trafficking as '*the* act' of victimization that allowed the plaintiff to bring suit under Section 1595" and then (2) "assume that knowledge of *the act* means knowledge of the *specific victim*." 76 F.4th at 556. The Eleventh Circuit's interpretation, in addition to being inconsistent with the text of the statute, would lead to the absurd result "that the larger the sex-trafficking venture and the more extensive [the defendant's] participation in the venture—and so the less likely it is to have known the specifics of individual victims—the harder it should be for a victim to obtain civil relief." *Id.*

Unfortunately, though, the Seventh Circuit's interpretation of § 1595 has its own problems. In finding that § 1595 requires only "constructive knowledge that a venture *generally* has violated Section 1591," *id.* at 558, the Seventh Circuit essentially held that a defendant (such as a particular hotel) need only have constructive (not actual) knowledge that at some unspecified time in the past (perhaps 30 years ago) the defendant participated in or benefitted from an unspecified act of sex trafficking by an unspecified sex trafficker involving an unspecified victim. In other words, as the

Seventh Circuit would have it, a defendant need not be aware of a single actual violation of § 1591(a) in order to have the requisite *mens rea* for civil liability under § 1595. Instead, "general, abstract knowledge of potential trafficking" by a venture would be sufficient. *Id.* at 558 n.13 (quoting *M.L. v. craigslist, Inc.*, NO. C19-6153 BHS-TLF, 2020 WL 5494903, at *5–6 (W.D. Wash., Sept. 11, 2020)).

The Seventh Circuit's interpretation is no more consistent with the text of the statute—and no sounder as a policy matter—than the Eleventh Circuit's interpretation. For one thing, as the dissent in *G.G.* pointed out, "there is no such thing as a general violation of § 1591," *id.* at 568 (Kirsch, J., dissenting); like every crime, a violation of § 1591(a) involves a specific person committing a specific act in a specific place at a specific date and time. For another, *G.G.*'s construction of the statute does exactly what the Seventh Circuit said it was trying to avoid: It "unjustifiably bridges the scienter gap between 'should have known' and 'might have been able to guess.'" *Id.* at 557 (quoting *S.J. v. Choice Hotels Int'l*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020)). Under *G.G.*, it would be nearly impossible for a plaintiff *not* to satisfy § 1595's knowledge requirement, especially when the defendant is a hotel. After all, just about every hotel has "general, abstract" knowledge that a violation of § 1595 likely occurred in one of its rooms at some point in its history.

-21-

The problem, again, is with the poor drafting of § 1595.  Read literally, the statute authorizes someone who is a victim of sex trafficking to sue *anyone* who "knowingly benefits . . . from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter."  In other words, read literally, the statute authorizes any sex-trafficking victim to sue any defendant (such as a hotel) who at any time in the past (even decades ago) knowingly benefitted from participating in any venture (even if the venture had nothing to do with the plaintiff) that committed any act that violated § 1591(a) (even if the plaintiff was not the victim of that act).  That cannot be what Congress intended.

Having reviewed the case law addressing § 1595's scienter requirement, this Court finds the most workable standard to be that applied *S.J. v. Choice Hotels International*, 473 F. Supp. 3d 147 (E.D.N.Y. 2020), a case that *G.G.* cited but apparently did not find persuasive.  According to *S.J.*, in order to be held liable under § 1595, "the civil defendant needed to have constructive knowledge of a non-generalized and non-sporadic—a 'particular'—venture . . . ."  *G.G.*, 76 F.4th at 557 (citing *S.J.*, 473 F. Supp. 3d at 154).  In other words, to satisfy § 1595's knowledge element, a plaintiff must plead and ultimately prove that the defendant had actual or constructive knowledge of the *particular* sex-trafficking venture that harmed the plaintiff, although the defendant need not know that the plaintiff was a victim of that venture.  In this case,

-22-

for example, SHI must have actual or constructive knowledge that the traffickers who victimized T.S. were engaged sex trafficking that violated § 1591(a). Although T.S. must have been harmed by *that* sex-trafficking venture—that is, by the particular sex-trafficking venture of which SHI had actual or constructive knowledge—it is not necessary that SHI be aware of T.S., much less be aware that T.S. was trafficked.

Turning to the amended complaint, the Court finds that the vast majority of T.S.'s allegations against Wyndham fail to meet this standard. T.S.'s allegations regarding Wyndham's general knowledge of sex trafficking in the hotel industry are plainly insufficient, *see S.J.*, 473 F. Supp. 3d at 154, as are her allegations that Wyndham was aware that guests of the Brooklyn Center Super 8 had complained about crime and prostitution at or near the hotel. (After all, not every criminal act—or even act of prostitution—is a federal sex-trafficking crime.) Also insufficient is T.S.'s allegation that her sex traffickers booked a room at the Brooklyn Center Super 8 through Wyndham's online booking system, as T.S. offers no reason why Wyndham would know that those rooms were being reserved by sex traffickers for use in sex trafficking. Finally, T.S. alleges that Wyndham would have seen the September 2013 note in the hotel records system stating that a minor was staying in a room and that prostitution-related activities were occurring in that room. But a voluntary report of unlawful activity *by* the Brooklyn Center Super 8 would not suggest to Wyndham that the hotel was *itself*

-23-

participating in sex trafficking.  After all, if the hotel was knowingly participating in a crime, it would almost certainly not make a record of that crime.

What saves T.S.'s claim, however, is that she has plausibly alleged an agency relationship between Wyndham and SHI, and thus she may impute SHI's knowledge to Wyndham.  *See, e.g.*, *J.L.*, 521 F. Supp. 3d at 1060 (explaining that to satisfy elements of § 1595 claim, plaintiff "may impute to the defendant the acts, omissions, and state of mind of an agent of the defendant"); Restatement (Third) of Agency § 5.03; *St. Paul Fire & Marine Ins. Co. v. F.D.I.C.*, 968 F.2d 695, 700 (8th Cir. 1992) ("In general, an agent's actual notice or knowledge may be imputed to the agent's principal.").  T.S. has plausibly alleged that employees of SHI knew of the particular sex-trafficking venture that victimized her—specifically, that the employees were familiar with her pimps, knew that they were pimps, knew that they were using the hotel's rooms for commercial sex acts, and, on at least one occasion, knew that a minor was present in a room that the pimps were using for commercial sex acts.  These allegations are sufficient to make plausible T.S.'s claim that SHI acted with the knowledge required by § 1595—and, because T.S. has plausibly alleged that SHI's employees acted as Wyndham's agents, these allegations are also sufficient to make plausible T.S.'s claim that Wyndham acted with the knowledge required by § 1595.

*c.  Participation*

Next, T.S. must plausibly allege that Wyndham participated in Venture 1 (the sex trafficking) or Venture 2 (the hotel).  *See* 18 U.S.C. § 1595;  *G.G.*, 76 F.4th at 553. Section 1595 does not define what it means to participate in a venture, and the Court agrees with *G.G.* and *Red Roof Inns* that courts should not import the definition of "participation in a venture" from § 1591.  *See* 18 U.S.C. § 1591(e)(4) ("The term 'participation in a venture' means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)."); *see also Red Roof Inns*, 21 F.4th at 724 (noting that § 1591 limits its definitions to that section, and that importing § 1591's definition of participation into § 1595 would render the "should have known" language from § 1595 superfluous); *G.G.*, 76 F.4th at 558 & n.14 (stating that "we should not import [§ 1591's] definition into Section 1595" and collecting cases declining to do so).

T.S. urges that, in defining "participation," the Court should follow the analysis of *G.G.*  On this point, however, the Seventh Circuit's analysis is so confused that there is no single path to follow.

First, despite expressly stating that it "should not" import § 1591's definition of "participation" into § 1595, *G.G.* starts off by doing just that, declaring that because "Section 1591's definition can establish the upper limits of 'participation' under Section 1595 . . . .'[p]articipating' does not . . . require more than 'assisting, supporting, or

-25-

facilitating' a venture that violates Section 1591." 76 F.4th at 558–59 (quoting 18 U.S.C.

§ 1591(e)(4)).  The Seventh Circuit then broadened that already broad definition by

asserting that a plaintiff could establish such participation merely "by showing 'a

continuous business relationship' between the participant and the trafficker." *Id.* at 559

(citation omitted); *see also id.* at 560 ("To survive a motion to dismiss, all that is

necessary is for a plaintiff to allege such a 'continuous business relationship,' which

gives rise to an inference, drawn in the plaintiff's favor, that the civil defendant

facilitated the venture's success.").

Once again, this cannot be what Congress intended.  If the Seventh Circuit is

taken at its word, then *everyone* in a "continuous business relationship" with the

Brooklyn Center Super 8—including the utility company that furnishes electricity to the

hotel, the contractor who plows the hotel's parking lot, and the vendor who services the

hotel's vending machines—is a "participant" for purposes of § 1595.  And those

"participants" would not be saved from liability under § 1595 by the scienter

requirement, at least as interpreted by *G.G.*  Again, the Seventh Circuit requires only

"general, abstract knowledge" that a venture could "potential[ly]" have committed a

sex-trafficking violation.  *Id.* at 558 n.13, 559 (citation omitted).  Because the utility

company or plowing company or vendor will know—as everyone knows— that sex

trafficking occurs in hotels (especially inexpensive hotels, such as Super 8), they would

either have to refuse to provide electricity or snow plowing or soft drinks to the

Brooklyn Center Super 8 or face potential liability under § 1595.  At oral argument,

T.S.'s counsel was commendably candid in admitting that *G.G.*'s reading of § 1595

would, as a practical matter, impose strict liability on hotels, and strict liability on

anyone who is in a "continuous business relationship" with hotels.

Perhaps reflecting second thoughts about the "continuous business relationship"

standard, *G.G.* later backtracked and said that, to be a "participant" for purposes of

§ 1595, a defendant must be more than "an arms-length seller of off-the-shelf products"

to the venture that violated § 1591(a).  *Id.* at 562; *see also id.* at 563–64 ("[W]e read Section

1595(a)'s standard of knowing benefit from participation in a venture that has violated

Section 1591 to require more than . . . 'mere passive nonfeasance' or an 'arm's length,

passive, and largely indifferent' relationship with the criminal." (quoting *Twitter, Inc. v.

Taamneh*, 598 U.S. 471, 500 (2023))).  The Seventh Circuit went on emphasize that

Salesforce could be held liable under § 1595 because its relationship with Backpage had

involved "multiple contracts over a number of years whereby Salesforce provided

Backpage with software designed specifically for Backpage and affirmative,

'personalized support.'"  *Id.* at 563; *see also id.* ("This was not a sale by a 'remote

intermediary' but the active participation of a contractual partner.").  At bottom, *G.G.* is

far from clear about which "continuous business relationships" amount to "participation" and which do not.

This Court agrees with the D.C. Circuit that "something more than engaging in an ordinary buyer-seller transaction is required to establish 'participation' in an unlawful venture." *Doe 1 v. Apple Inc.*, 96 F.4th 403, 415 (D.C. Cir. 2024). When the utility company provided electricity to the Brooklyn Center Super 8, it was not "participating" in Venture 2, any more than it was "participating" in any of the thousands of other "ventures" to which it provided electricity. And when the local convenience store sold gasoline and snacks to the pimps who trafficked T.S., it was not "participating" in Venture 1, any more than it was "participating" in the "ventures" engaged in by the hundreds of others who stopped at the store for gas or food. Again, an entity that does nothing more than "engag[e] in an ordinary buyer-seller transaction" with a venture—that is, simply provide to the venture the same products and services that it provides the general public—does not "participate" in that venture. *Apple Inc.*, 96 F.4th at 415.

Turning to the amended complaint, the Court finds that because T.S. has plausibly alleged that SHI's employees were agents of Wyndham, and because "[u]nder established rules of agency law, acts within the scope of the agency committed by the agent are imputable to the principal," *Pearce v. Gen. Am. Life Ins. Co.*, 637 F.2d 536, 543

-28-

(8th Cir. 1980), T.S. has plausibly alleged that Wyndham participated in both Venture 1 and Venture 2. As to Venture 1, T.S. has alleged not just that SHI/Wyndham rented a room to T.S.'s traffickers—which would be an "ordinary buyer-seller transaction"—but that SHI/Wyndham provided services to her traffickers (i.e., such as extra housekeeping services and excessive towels) that it did not provide to the general public. As to Venture 2, if SHI's employees were in fact agents of Wyndham, then obviously Wyndham "participated" in the operation of the Brooklyn Center Super 8.

### d. Benefit

Finally, T.S. must allege that Wyndham "knowingly benefit[ted]" from its participation in Venture 1 or Venture 2. 18 U.S.C. § 1595. The Court agrees with *G.G.* that it is sufficient for "a plaintiff to allege that the defendant 'knowingly benefitted' by alleging only that the defendant was aware that it was benefitting in some way from its participation in the venture." 76 F.4th at 564. T.S.'s allegations on this point are plainly sufficient, as T.S. has pleaded (among other things) that SHI/Wyndham knew it was receiving a benefit when it rented a room to T.S.'s traffickers.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT the motion of defendants Wyndham Hotels & Resorts,

Inc., Wyndham Hotel Group, LLC, and Super 8 Worldwide, Inc. to dismiss plaintiff's

first amended complaint [ECF No. 34] is DENIED.

Dated:  August 23, 2024                          s/Patrick J. Schiltz_____
                                                 Patrick J. Schiltz, Chief Judge
                                                 United States District Court