**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| JANE DOE (T.S.), AN INDIVIDUAL<br>Plaintiff<br><br>v.<br><br>WYNDHAM HOTELS & RESORTS, INC.,<br>WYNDHAM HOTEL GROUP, LLC, DAYS<br>INNS WORLDWIDE, INC., SUPER 8<br>WORLDWIDE, INC., SARAH<br>HOSPITALITY INC., MAPLEWOOD<br>LODGING, LLC, PERCY POONIWALA,<br>DINAZ POONIWALA, BPP MINNESOTA,<br>LLC, AND JANUS HOTEL<br>MANAGEMENT SERVICES, LLC | Defendants<br><br><br>Case No. 0:23-cv-02530-PJS-ECW |

**FIRST AMENDED  CONSOLIDATED COMPLAINT**

COMES NOW Plaintiff Jane Doe (T.S.), by and through the undersigned counsel, and respectfully submits her First Amended Complaint for damages.

**SUMMARY**

1.     Jane Doe (T.S.) is a survivor of sex trafficking. During 2013, Jane Doe (T.S.)'s traffickers repeatedly and regularly trafficked Jane Doe (T.S.) at the Days Inn located at 3030 Southlawn Dr, Maplewood, MN 55109 ("Maplewood Days Inn"), the Super 8 located at 1739 Old Hudson Rd, St Paul, MN 55106 ("St. Paul Super 8") and Super 8 located at 6445 James Circle N. in Brooklyn City, Minnesota (hereinafter "Brooklyn Center Super 8"). This lawsuit seeks compensation for her trafficking at these hotels.

2.     The Maplewood Days Inn was jointly operated by Wyndham Hotels & Resorts, Inc., Wyndham Hotel Group, LLC, and Days Inn Worldwide, Inc., (collectively "the Days Inn Brand Defendants" or "Wyndham") and Percy Pooniwala, Dinaz Pooniwala, and Maplewood

1

Lodging (collectively "Days Inn Franchisee"). Days Inn Franchisee provided "boots on the ground" at the Maplewood Days Inn, while the Days Inn Brand Defendants directly participated in and controlled relevant hotel operations, including by playing a central role in the rental of rooms and through intimate involvement in aspects of operations related to the detection of and response to sex trafficking. Days Inn Franchisee also acted as the agent of the Days Inn Brand Defendants when operating the Maplewood Days Inn.

3.      As discussed herein, the Days Inn Brand Defendants and Days Inn Franchisee each derived a financial benefit from widespread use of the Maplewood Days Inn for sex trafficking, including the trafficking of Jane Doe (T.S.). Despite obvious and apparent signs of sex trafficking at the Maplewood Days Inn, the Days Inn  Brand Defendants and Days Inn Franchisee continued renting hotel rooms to these traffickers and operated the Maplewood Days Inn in a way that enabled sex trafficking, including by creating a haven where traffickers could operate without disruption from hotel staff and with minimal risk of detection and traceability.

4.      The St. Paul Super 8 was jointly operated by Wyndham Hotels & Resorts, Inc., Wyndham Hotel Group, LLC, and Super 8 Worldwide, Inc., (collectively "Super 8 Brand Defendants" or "Wyndham") and BPP Minnesota, LLC and Janus Hotel Management Services, LLC  (collectively "St. Paul Super 8 Franchisee"). Super 8 Franchisee provided "boots on the ground" at the St. Paul Super 8, while the Super 8 Brand Defendants directly participated in and controlled relevant hotel operations, including by playing a central role in the rental of rooms and through intimate involvement in aspects of operations related to the detection of and response to sex trafficking. Super 8 Franchisee also acted as the agent of the Super 8 Brand Defendants when operating the St. Paul Super 8.

2

5.      As discussed herein, the Super 8 Brand Defendants and Super 8 Franchisee each derived a financial benefit from widespread use of the St. Paul Super 8 for sex trafficking, including the trafficking of Jane Doe (T.S.). Despite obvious and apparent signs of sex trafficking at the St. Paul Super 8, the Super 8 Brand Defendants and Super 8 Franchisee continued renting hotel rooms to these traffickers and operated the St. Paul Super 8 in a way that enabled sex trafficking, including by creating a haven where traffickers could operate without disruption from hotel staff and with minimal risk of detection and traceability.

6.      The Brooklyn Center Super 8 was jointly operated by Wyndham Hotels & Resorts, Inc., Wyndham Hotel Group, LLC, and Super 8 Worldwide, Inc., (collectively "Super 8 Brand Defendants" or "Wyndham") and Sarah Hospitality, Inc., d/b/a Super 8 Brooklyn Center ("SHI"). SHI provided "boots on the ground" at the Brooklyn Center Super 8, while the Super 8 Brand Defendants directly participated in and controlled relevant hotel operations, including by playing a central role in the rental of rooms and through intimate involvement in aspects of operations related to the detection of and response to sex trafficking. SHI also acted as the agent of the Super 8 Brand Defendants when operating the Brooklyn Center Super 8.

7.      As discussed herein, the Super 8 Brand Defendants and SHI each derived a financial benefit from widespread use of the Brooklyn Center Super 8 for sex trafficking, including the trafficking of Jane Doe (T.S.). Despite obvious and apparent signs of sex trafficking at the Brooklyn Center Super 8, the Super 8 Brand Defendants and SHI continued renting hotel rooms to these traffickers and operated the Brooklyn Center Super 8 in a way that enabled sex trafficking, including by creating a haven where traffickers could operate without disruption from hotel staff and with minimal risk of detection and traceability.

8.     Jane Doe (T.S.) files this civil lawsuit under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, *et seq*, for the harms and losses she suffered because of the sex trafficking she endured at the Maplewood Days Inn and St. Paul Super 8, which Defendants benefited from and facilitated.

## PARTIES

9.     Jane Doe (T.S.) is a natural person who is currently a resident and citizen of Minnesota. She has filed a motion to proceed under a pseudonym. Given the nature of the allegations in this lawsuit, there is a collective, recognized, and compelling interest in not publicly revealing the identity of Jane Doe (T.S.).

10.     Wyndham Hotels & Resorts, Inc., f/k/a Wyndham Worldwide Corporation ("WHR") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Defendant WHR is the successor entity to the hotel business of Wyndham Worldwide Corporation and its former subsidiaries. Defendant WHR is responsible, as successor, for all liabilities of Wyndham Worldwide Corporation and its predecessor subsidiaries related to franchising, controlling, and operating the Maplewood Days Inn. All references to WHR include the acts and omissions of predecessor entities for which WHR is responsible, including Wyndham Worldwide Corporation and its former subsidiaries.

11.     Wyndham Hotel Group, LLC ("WHG") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, WHG is a wholly owned subsidiary of WHR and a former subsidiary of Wyndham Worldwide Corporation.

12.     Days Inn Worldwide, Inc. ("DIW") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, DIW is a

direct subsidiary of WHG, an indirect subsidiary of WHR, and a former subsidiary of Wyndham Worldwide Corporation.

13.    On information and belief, Defendant Percy Pooniwala is a resident and citizen of Minnesota, having an address at 10155 Bridgewater Court, Woodbury, Minnesota 55129.

14.    On information and belief, Defendant Dinaz Pooniwala is a resident and citizen of Minnesota, having an address at 10155 Bridgewater Court, Woodbury, Minnesota 55129.

15.    Maplewood Lodging, LLC, is a Minnesota limited liability company with its principal address at 2401 Prior Avenue North, Roseville, MN  55113.

16.    At relevant times, Percy Pooniwala, Dinaz Pooniwala, and Maplewood Lodging, LLC, owned and operated the Maplewood Days Inn through Wyndham's franchising system. They are referred collectively to herein as "Days Inn Franchisee."

17.    Sarah Hospitality, Inc., d/b/a Super 8 Brooklyn Center ("SHI"), is a Minnesota corporation that, during the period at issue, owned, operated, controlled, and/or managed Brooklyn Center Super 8 through the Wyndham franchising system.

18.    Defendant Super 8 Worldwide, Inc. ("S8W") is a is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, S8W is a direct subsidiary of WHG, an indirect subsidiary of WHR, and a former subsidiary of Wyndham Worldwide Corporation.

19.    BPP Minnesota, LLC ("BPP") is a Delaware limited liability company that conducted business in Minnesota. At all relevant times, BPP operated the St. Paul Super 8 through the Wyndham franchising system.

20.    Janus Hotel Management Services, LLC  ("Janus") is a Florida limited liability company that conducted business in Minnesota.

21.     At all relevant times, BPP contracted with Janus to provide management services at the St. Paul Super 8. BPP and Janus jointly participated in on-the-ground operations at the St. Paul Super 8, jointly employed the hotel staff and management, and are referred to collectively herein as "Super 8 Franchisee."

22.     WHR, WHG, DIW, and S8W are referred to collectively as "Wyndham Brand Defendants" or Wyndham.

23.     SHI, Days Inn Franchisee and Super 8 Franchisee are referred to collectively as "Wyndham Franchisees."

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

25.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

26.     Jane Doe (T.S.) was trafficked in this District and Division.

## SEX TRAFFICKING AND THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT

27.     Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

28.     In 2008, Congress, through the TVPRA, expanded the remedies available to survivors of sex trafficking. In so doing, it recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while

not criminally liable under the TVPRA—benefit from participation in ventures that facilitate sex trafficking.

29.     In the TVPRA, Congress adopted a broad definition of sex trafficking to "address the increasingly subtle methods of traffickers who place their victims in modern-day slavery."[1]

30.     The TVPRA defines sex trafficking as the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[2]

## FACTS

**I.      Jane Doe (T.S.) was a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed, and Controlled by Defendants.**

31.     Jane Doe (T.S.) is a victim of sex trafficking under 18 U.S.C. §1591(a) and §1595(a). Over a period of several months in 2013, she was trafficked for sex while she was still a minor. In addition, her traffickers used physical violence, threats and intimidation, manipulation, and restrictions on her freedom to cause her to engage in commercial sex for their financial benefit.

32.     Jane Doe (T.S.)'s traffickers targeted her when she was 15 years old and in a vulnerable state, having just run away from home. Her traffickers threatened her, posted advertisements online, and forced her to have commercial sex for their financial benefit.

33.     Several individuals were involved in trafficking Jane Doe (T.S.) at hotels, including the Maplewood Days Inn, the St. Paul Super 8 and Brooklyn Center Super 8.

34.     These individuals were also trafficking other minors at the same time as they were trafficking Jane Doe (T.S.).

---

[1] H.R. REP. NO. 106-939, at 101; 18 U.S.C. § 1591(e)(5).
[2] 18 U.S.C. §1591; 22 U.S.C. § 7102.

35. Jane Doe (T.S.)'s traffickers and their associates used various techniques to maintain control over her and to cause her to engage in commercial sex for their financial benefit, including regularly beating her and leaving visible bruising, using threats of violence against her and her family, making her totally dependent and emotionally dependent on them, and restricting her freedom. One of Jane Doe (T.S.)'s traffickers told her that her only way out of the trafficking life was death.

36. Jane Doe (T.S.) was able to escape the trafficking situation in late 2013 when she gained access to her traffickers' computer while they were sleeping and sent a message seeking help, which ultimately forwarded to the St. Paul Police Department Human Trafficking Unit. Even then, her traffickers continued threatening and coercing her to attempt to prevent her from cooperating with law enforcement. In December 2013, two of her traffickers were arrested on sex trafficking charges. Both were ultimately found guilty of first-degree sex trafficking of a minor.

37. During her trafficking period, Jane Doe (T.S.)'s traffickers moved her around between their preferred hotels, which included the Maplewood Days Inn, the St. Paul Super 8 and the Brooklyn Center Super 8.

38. Jane Doe (T.S.)'s traffickers used the control they maintained through the above-described methods to require Jane Doe (T.S.) to engage in commercial sex at the Maplewood Days Inn during approximately 4 to 5 stays amounting to a total of approximately 20 to 30 days that she was trafficked at this hotel. Each day she was trafficked at this hotel, she was forced to see between 7 and 20 johns. Thus, Jane Doe (T.S.) was harbored, maintained, provided, solicited, and forced to engage in commercial sex at the Maplewood Days Inn hundreds of times while she was just 15 years old.

39.     Jane Doe (T.S.)'s traffickers used the control they maintained through the above-described methods to require Jane Doe (T.S.) to engage in commercial sex at the St. Paul Super 8 on repeated occasions, with her stays amounting to a total of approximately 20 to 30 days that she was trafficked at this hotel. Each day she was trafficked at this hotel, she was forced to see between 7 and 20 johns. Thus, Jane Doe (T.S.) was harbored, maintained, provided, solicited, and forced to engage in commercial sex at the St. Paul Super 8 hundreds of times while she was just 15 years old.

40.     Jane Doe (T.S.)'s traffickers used the control they maintained through the above-described methods to require Jane Doe (T.S.) to engage in commercial sex at the Brooklyn Center Super 8  on repeated occasions, with her stays amounting to a total of approximately 20 to 30 days that she was trafficked at this hotel. Each day she was trafficked at this hotel, she was forced to see between 7 and 20 johns. Thus, Jane Doe (T.S.) was harbored, maintained, provided, solicited, and forced to engage in commercial sex at the St. Paul Super 8 hundreds of times while she was just 15 years old.

41.     During the period that Jane Doe (T.S.) was trafficked at the Maplewood Days Inn, the St. Paul Super 8 and the Brooklyn Center Super 8, staff of each hotel had repeated opportunities to observe her. While with her trafficker or his associate, she would encounter the same staff members on multiple occasions, including the front desk staff and housekeeping staff. She was only 15 years old and appeared consistent with her age. It was obvious to a reasonable observer that Jane Doe (T.S.) was a minor with people who were not her parents.

42.     During the period that she was trafficked at the Maplewood Days Inn, the St. Paul Super 8 and the Brooklyn Center Super 8, Jane Doe (T.S.)'s trafficking had profound effects on her, including effects on her appearance, demeanor, movements throughout the hotel, and her

interactions with others. This manifested in signs of Jane Doe (T.S.)'s trafficking that were obvious and apparent to the staff at the Maplewood Days Inn, the St. Paul Super 8 and the Brooklyn Center Super 8. These signs included visible bruising, being forced to wear provocative clothing in common areas, a nervous and fearful demeanor, and constantly being in the presence of or monitored by her older traffickers. These signs matched "red flags" of trafficking that the hotel industry and each Defendant recognized to be indicators of sex trafficking in a hotel environment.

## II.    The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

43.    The widely known and pervasive relationship between sex trafficking and the hotel industry cannot be disregarded and necessarily shapes what each Defendant knew or should have known regarding the trafficking at its respective hotel(s), including the trafficking of Jane Doe (T.S.).

44.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[3] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[4] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[5] Hotels have been found to account for over 90% of the commercial exploitation of children.[6]

---

[3] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[4] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57774091e4b0f168323a1ed7.

[5] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[6] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

45.     Because of this link between hotels and sex trafficking, government bodies, law enforcement agencies, non-profits, and hotel trade associations—including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, EPCAT, and others—have devoted significant efforts to intervening and educating the hotel industry, including each of the Defendants, on best practices for identifying and responding to sex trafficking.[7]

46.     This resulted in the development of "red flags" of sex trafficking. Law enforcement agencies and other organizations with subject-matter expertise identified specific indicators of the presence of sex trafficking at a hotel. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel. These recurring indicators are known as "red flags" of sex trafficking.

47.     Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff throughout a hotel[8] include:

- individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;
- a group of girls who appears to be traveling with an older female or male;
- a group with similar tattoos, which can indicate "branding" by a trafficker;
- individuals showing fear, anxiety, tension, submissiveness and/or nervousness;
- individuals who seem disoriented;
- individuals showing signs of physical abuse;

---

[7] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .
[8] *See id.*

11

- individuals showing signs of restrain or confinement;
- individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;
- individuals with signs of untreated illness or injuries;
- individuals who appear to lack freedom of movement;
- individuals who are being constantly monitored and/or escorted around the hotel;
- individuals who avoid eye contact;
- individuals who avoid interactions with others;
- individuals who are not in possessions of their own identification;
- individuals who have few or no personal possessions;
- individuals who dress provocatively;
- a high volume of men who are not registered guests entering and exiting a room; and
- individuals who wait in common areas while other men frequent the room.

48.    Recognized "red flags" of sex trafficking that can be detected by front-desk staff and hotel security[9] include:

- patrons appeared distressed at check-in;
- the same person reserving multiple rooms;
- rooms paid for with cash or prepaid cards;
- rooms are paid for one day at a time;
- requests for isolated rooms or rooms close to an exit;
- use of hotel computers for adult oriented or sexually explicit websites;
- patrons not forthcoming about identifying information when registering;
- individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;
- individuals lack identification;
- car in the parking lot is parked so license plate is not visible;
- individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and

---

[9] *See id.*

12

- individual appears to be giving scripted responses.

49.     Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff[10] include:

- constant use of the "Do Not Disturb" sign;
- requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;
- refusal of cleaning services for multiple days;
- excessive amounts of cash in a room;
- presence of multiple computers, cell phones, pagers, or other technology;
- the same person reserving multiple rooms;
- individuals leaving the room infrequently, not at all, or at unusual hours;
- individuals loitering in hallways or appearing to monitor a room;
- excessive alcohol in a room;
- illegal drugs in a room;
- evidence of pornography;
- excessive number of people staying in a room;
- guests with few or no personal possessions in room;
- provocative clothing and shoes;
- constant flow of men into a room at all hours; and
- excessive amounts of sex paraphernalia in rooms.

50.     The organizations who developed these "red flags," then educated and trained the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff. [11]

---

[10] *See id.*
[11] / Department of Homeland Security, Blue Campaign Toolkit, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.;

51.     Before Jane Doe (T.S.)'s trafficking and its hotel(s), each Defendant was educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel environment. At all relevant times, each Defendant acknowledged and recognized these "red flags" specifically as signs of sex trafficking and instructed and trained their staff to treat them as signs of sex trafficking when observed in its hotel(s).

52.     It is, and has at all relevant times, been well established that signs of commercial sex in a hotel environment are "red flags" for the presence of sex trafficking.

53.     There is a well-known link between commercial sex in a hotel environment and sex trafficking. The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in commercial sex are subject to force, fraud, or coercion.[12] As a result, these women are victims of sex trafficking. Most federal sex trafficking prosecutions involve individual traffickers acting as "pimps" who are operating without direction from or connection to a larger criminal network.[13] It is well known that the "traffickers in hotel/motel based commercial sex situations are often individual controllers, more commonly known as 'pimps.'"[14]

54.     State, local, federal, and international governments and law enforcement agencies have long recognized the link between commercial sex and sex trafficking. For example:

---

www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-%20Wisconsin%20AG%20Office%281%29.pdf

[12] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

[13] Human Trafficking Institute, 2020 Federal Human Trafficking Report 28 (2021), https://traffickinginstitute.org/wp-content/uploads/2022/01/2020-Federal-Human-Trafficking-Report-Low-Res.pdf.

[14] National Human Trafficking Hotline, *Hotel-Motel Based*, https://humantraffickinghotline.org/en/sex-trafficking-venuesindustries/hotelmotel.

14

- "The U.S. Government adopted a strong position against legalized prostitution in a December 2002 National Security Presidential Directive based on evidence that prostitution . . . . fuels trafficking in persons, a form of modern-day slavery."[15]

- In 2006 the United Nations Commission on Human Rights, Special Rapporteur or Trafficking in Persons recognized that "[f]or the most part, prostitution, as actually practiced in the world, usually does satisfy the elements of trafficking."[16]

- By 2008, a report of the Illinois Criminal Justice Information Authority concluded "young women in the sex trade who are controlled by a pimp should not be regarded as girls in prostitution, but as victims of violence who need assistance in safely exiting prostitution."[17]

- In 2010, the Anaheim Police Department (APD) recognized that a significant portion of those involved in prostitution who it came into contact with were likely trafficking victims and adopted a new approach that focused on rescuing women from their pimps and redirecting their lives.[18]

- In 2013, the New York State Court System launched the Human Trafficking Intervention Initiative recognizing that many individuals who end up in criminal courts are on prostitution charges "are recruited into the commercial sex industry by force, fraud, and/or coercion."[19]

55.    When governmental bodies, law enforcement agencies, non-profits, and hospitality-industry organizations developed the "red flags" of sex trafficking in a hotel, they recognized that signs of commercial sex are and should be treated as signs of sex trafficking. Based on the known link between commercial sex and trafficking and the patterns of sex trafficking in hotels, these entities recognized that certain signs associated with commercial sex are important indicators for the detection of sex trafficking in a hotel.

---

[15] United States Department of State, *The Link Between Prostitution and Sex Trafficking* https://2001-2009.state.gov/r/pa/ei/rls/38790

[16] U.N. Escor, Comm'n on Human Rights, *13 Integration of the Human Rights of Women and a Gender Perspective, Report of the Special Rapporteur on the Human Rights Aspects of the Victims of Trafficking in Persons, Especially Women and Children, ¶ 42 U.N. Doc. E/CN.4/2006/62 (Feb. 20, 2006) (Sigma Huda)

[17] https://humantraffickinghotline.org/sites/default/files/Domstic%20Sex%20Trafficking%20Chicago%20-%20ICJIA.pdf

[18] Steve Marcin, *Prostitution and Human Trafficking: A Paradigm Shift*, Law Enforcement Bulletin, https://leb.fbi.gov/articles/featured-articles/prostitution-and-human-trafficking-a-paradigm-shift#:~:text=After%20close%20analysis%20of%20prostitutes,tactic%20in%20addressing%20the%20problem.

[19] Center for State Court Innovation, *State Court Snapshot: New York State's Human Trafficking Intervention* Courts, https://cjinvolvedwomen.org/wp-content/uploads/2016/12/HTIC-1pager.pdf

56.     Defendants, as members of the hotel industry, were educated and trained on the link between commercial sex in a hotel and sex trafficking. Accordingly, as of the time of Jane Doe (T.S.)'s trafficking, each Defendant knew and recognized that signs of commercial sex in a hotel are and should be treated as signs of sex trafficking.

57.     Each Defendant knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that ordinary prudence required treating signs of commercial sex activity as signs of sex trafficking. Under the circumstances, ordinary prudence further required each Defendant to avoid benefiting from rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

58.     The most effective weapon against sexual exploitation and human trafficking is education and training.[20] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[21]

59.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[22] In reference to companies like the Defendants,

---

[20] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[21] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[22] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

60.     Because of the prevalence of human trafficking in hotels and the established body of knowledge about how hotels can detect and respond to signs of sex trafficking, it has long been apparent that the decision of a hotel or hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and deter trafficking is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

61.     The Wyndham Brand Defendants have made the choice to ignore their knowledge of sex trafficking in their hotels and instead to inadequately train, respond and enforce their own developed and adopted sex trafficking policies. Thus, they have chosen to continue to benefit from sex trafficking of victims like Jane Doe (T.S.).

III.    **Sex Trafficking at Wyndham Branded Hotels was well Known by Wyndham Brand Defendants.**

62.     The Wyndham Brand Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. They have known, since well before Jane Doe (T.S.)'s that sex trafficking was ongoing and widespread at Wyndham properties, including the Maplewood Days Inn, the St. Paul Super 8 and Brooklyn Center Super 8.

63.     In fact, the problem of sex trafficking at Wyndham hotels was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from facilitating child sex trafficking. Although the Wyndham Brand Defendants brand publicly committed to take steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[23]

_____

[23] https://endsexualexploitation.org/wyndham/

64.    In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[24] Each of the Wyndham Brand Defendants monitored criminal activity occurring at its branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the Maplewood Days Inn St. Paul Super 8 and Brooklyn Center Super 8 locations where Jane Doe (T.S.) was trafficked.

65.    Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham Brand Defendants' role in providing venues where sex trafficking has continued unabated for years. The Wyndham Brand Defendants monitored news stories and online reviews for indicia of criminal activity at their branded locations, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham hotels, including Days Inn and Super 8 properties:

- In July 2010, a man was arrested at a Days Inn in Metairie, LA on human trafficking charges and was accused of forcing North Carolina teens into prostitution.[25]

- In June 2011, a woman was sentenced to 9 years in prison for the sex trafficking of two 14-year-old girls. The girls were forced to work at the Days Inn in Hartford, Connecticut.[26]

- In February 2012, a man was arrested by FBI agents and members of the Human Trafficking Task Force on charges of sex trafficking of children for pimping out a 14-year-old girl who was rescued from a Days Inn in Florida.[27]

[24] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

[25] Michelle Hunter, *Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution*, The Times-Picayune (July 20, 2010), https://www.nola.com/news/crime_police/man-arrested-in-metairie-on-human-trafficking-charges-accused-of-forcing-north-carolina-teens-into/article_c113df92-9046-56a1-bc02-7c065f5a9435.html.

[26] *East Hartford Woman Sentenced to 9 Years In Prison for Sex Trafficking Of Two 14-Year-Old Girls*, Hartford Courant (June 24, 2011), https://www.courant.com/2011/06/24/east-hartford-woman-sentenced-to-9-years-in-prison-for-sex-trafficking-of-two-14-year-old-girls/.

[27] Alexandra Seltzer, Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14, The Palm Beach Post (Feb. 7, 2012), https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/.

- In 2012, the first successful prosecution of a human trafficking case in Wisconsin occurred after a man trafficking a woman at a Days Inn in Wausau, Wisconsin.[28]

- Three people were arrested in July 2014 in Fayetteville on human trafficking charges after holding a woman captive at a Days Inn.[29]

- In July 2014, three people were arrested and accused of kidnapping and torturing a woman for human trafficking out of a Days Inn in Orange County, CA.[30]

- In September 2014, two Nevada residents were arrested on sex trafficking charges. Officers set up surveillance at a Days Inn in Nashville and "it did not take long for officers to observe heavy foot traffic in and out of that hotel room consistent with a prostitution operation."[31]

- In April 2015, a Philadelphia man was sentenced for sex trafficking minors. The man worked as a security guard at a Days Inn in Philadelphia and "provided protection and assistance to sex traffickers operating at the motel in exchange for a daily fee."[32]

- In June 2015, two Brooklyn men charged with sex trafficking allegedly forced a teenage girl into prostitution from a Long Island City Days Inn.[33]

- In July 2015, after investigating possible prostitution at a Days Inn in Maryland, Frederick County sheriff's deputies charged a Hagerstown man with human trafficking after two teenage girls were forced into prostitution.[34]

- In March 2016, a 22 year-old Sandy Springs man was arrested in Athens, Ga., and charged with pimping a person under 18 and sex trafficking after holding a 16-year-

---

[28] Shereen Siewert, *Sex-trafficking cases hard to crack in Wisconsin*, Post Crescent (March 25, 2014), https://www.postcrescent.com/story/news/2014/03/25/sex-trafficking-cases-hard-to-crack-in-wisconsin/6884671/.

[29] Three arrested on human trafficking charges in NC, Fox8 (July 2, 2014), https://myfox8.com/news/three-arrested-on-human-trafficking-charges-in-nc/.

[30] Jeanne Kuang, Three Accused of Kidnapping, Torturing Woman for Human Trafficking in Orange County, NBC Los Angeles (July 30, 2014), https://www.nbclosangeles.com/news/three-accused-of-brutally-kidnapping-torturing-woman-for-human-trafficking-in-orange-county/65718/.

[31] Las Vegas Man, Woman Jailed on Prostitution Charges, City of Franklin, TN (Sept. 5, 2014), https://www.franklintn.gov/Home/Components/News/News/2563/.

[32] Philadelphia Man Sentenced for Sex Trafficking Conspiracy, U.S. Attorney's Office (April 9, 2015), https://www.fbi.gov/contact-us/field-offices/philadelphia/news/press-releases/philadelphia-man-sentenced-for-sex-trafficking-conspiracy.

[33] Jackie Strawbridge, *Cuffed Brooklyn Men Allegedly Pimped At LIC Hotel*, licpost (June 9, 2015), https://licpost.com/cuffed-brooklyn-men-allegedly-pimped-at-lic-hotel.

[34] Jeremy Arias, *Hagerstown man charged with trafficking of two teenage girls*, The Frederick News-Post (July 1, 2015), https://www.heraldmailmedia.com/story/news/local/2015/07/01/hagerstown-man-charged-with-trafficking-of-two-teenage-girls/45202521/.

19

old against her will at a Days Inn in Athens and forcing her to engage in sex in exchange for money.[35]

- In March 2018, Cobb County officers arrested two individuals on charges related to pimping and keeping a place of prostitution after a runaway child tipped them off to a prostitution ring operating out of a room at a Days Inn in Marietta, Georgia.[36]

- In May 2018, eight people were arrested at a Days Inn in St. Joseph, Missouri for charges including prostitution and drug-related charges.[37]

- In June 2021, a Missouri man was arraigned on 35 criminal charges involving crimes such as rape, sodomy, sexual trafficking of a child, promoting child pornography and sexual exploitation of a minor. Among the evidence for these charges were nude photographs of a minor and an adult taken in August 2020 at a Days Inn in Warrensburg, Missouri.[38]

- In November 2023, a woman was arrested for prostitution after a john attempted to shoot her in a Days Inn parking lot in York County, Pennsylvania following their sexual encounter at the hotel.[39]

- In 2010, a California man was arrested for trafficking a 16-year-old victim after being spotted by law enforcement with the minor at a Super 8 in California.[40]

- In November 2011, a man was sentenced for sex trafficking after he forced minor girls to engage in commercial sex for his financial benefit, including at a Super 8 Motel in Virginia.[41]

- In January 2011, a man was sentenced to life for child sex trafficking for requiring a minor to perform commercial sex services more than 50 times over a 14-day period at a Florida Super 8 Motel.[42]

---

[35] Dyana Bagby, Sandy Springs man arrested in Athens, Ga., for sex trafficking, RoughDraft atlanta (March 24, 2016), https://roughdraftatlanta.com/2016/03/24/sandy-springs-man-arrested-athens-ga-sex-trafficking/.

[36] https://www.13wmaz.com/article/news/crime/childs-tip-leads-to-pimp-prostitution-arrests-at-cobb-county-days-inn/93-527662214

[37] https://www.newspressnow.com/news/local_news/police-arrest-eight-in-prostitution-sting/article_116325ec-0326-5afb-8828-12d12ed65602.html

[38] https://www.warrensburgstarjournal.com/stories/warrensburg-juveniles-among-victims-in-suspected-child-trafficking-case,63069

[39] https://www.fox43.com/article/news/crime/paid-sexual-encounter-prostitution-brittany-abosede-arrest/521-f77491fc-5171-4272-8da8-8765e2971ef9

[40] https://www.wired.com/2010/11/epps/

[41] Gang member sentenced for sex trafficking in Prince William, News & Messenger (Manassas, Virginia) (November 4, 2011) https://plus.lexis.com/api/permalink/562d85d9-e662-4e4f-8f7f-67b52fa537e8/?context=1530671

[42] https://www.fbi.gov/jacksonville/press-releases/2011/ja011011.htm

- In June 2011, an MS-13 gang member was indicted for trafficking girls at a Super 8 Motel near Washington, D.C.[43]

- In 2012, four were indicted after forcing a 24-year-old woman to engage in commercial sex at Ohio hotels, including a Super 8.[44] In December 2012, a man was arrested for attempting to entice a 15-year-old girl to engage in prostitution at a Super 8 Motel in Oklahoma.[45]

- In April 2013, two were arrested for trafficking a juvenile girl at an Illinois Super 8.[46]

- In June 2013, a man was arrested on human trafficking charges after he forced a woman to engage in commercial sex at hotels, including a Louisiana Super 8 Motel.[47]

- A man was sentenced to 21 years in prison for sex trafficking his 16-year-old girlfriend starting in August 2013 at two hotels in Dallas, including a Super 8 Motel.[48]

- In 2013, a man was arrested at a Super 8 in Rhode Island and charged with trafficking a 17-year-old girl at the motel.[49]

- In September 2013, a Super 8 motel in Massachusetts was searched and a man was charged with sex trafficking of a 17-year-old developmentally disabled girl after staying with her at that hotel.[50]

- In November 2013, two pled guilty to sex trafficking charges after forcing a child to engage in commercial sex at Super 8 Motel in Texas.[51]

- In June 2014, two were charged with trafficking a 13-year-old girl at a Minnesota Super 8.[52]

---

[43] https://www.thepublicdiscourse.com/2011/10/4034/
[44] https://www.10tv.com/article/news/crime/crime-tracker/four-indicted-first-human-trafficking-case-franklin-county/530-36f713e6-5488-4465-90c0-7eb99504a635
[45] Man faces new sex-trafficking charges, Tulsa World (Oklahoma ) (March 9, 2013)
https://plus.lexis.com/api/permalink/a9062a1a-76b4-4811-89ab-5b0b3c877a88/?context=1530671
[46] https://www.channel3000.com/news/local-news/2-women-accused-of-human-trafficking-at-motel/article_98edf1d4-d231-5ea1-a6b9-e71c83f44750.html
[47] https://www.endslaverytn.org/news/tenn-man-booked-in-human-trafficking-newsarticle
[48] https://www.ice.gov/news/releases/dallas-gang-member-sentenced-21-years-federal-prison-child-sex-trafficking-conviction
[49] https://turnto10.com/archive/new-details-in-ardrey-sex-trafficing-investigation
[50] https://www.providencejournal.com/story/news/crime/2013/09/14/20130914-missouri-man-charged-with-sex-trafficking-in-mass-teens-disappearance-ece/35397014007/
[51] https://www.chron.com/news/article/two-plead-guilty-to-child-sex-trafficking-5000132.php
[52] https://www.grandforksherald.com/newsmd/moorhead-police-charge-two-with-sex-trafficking-13-year-old

66.    These articles are only limited representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham branded hotels. Moreover, on information and belief, the Wyndham Brand Defendants are aware of additional significant law enforcement activity related to trafficking at their hotels that was not reported in the media.

67.    Reviews of Days Inn and Super 8 branded properties, which upon information and belief, each of the Wyndham Brand Defendants, monitored regularly, also show both the pervasiveness of sex trafficking at Days Inn branded properties and the Wyndham Brand Defendants' knowledge of the same. For example:

- A June 2007 Tripadvisor review from a Days Inn in Fresno, CA states "…Which leads me to note the problems with this motel--its location. Because it's close to the 99, and gets a lot of quick travelers up and down the highway, it seems to be the neighborhood to find a prostitute. During our one day stay, we saw at least 4. In the DAYTIME!! And although we weren't bothered by anyone, and the motel itself was quiet, if you've got a family you may want to skip this one."[53]

- A July 2007 Tripadvisor review from a Days Inn in Philadelphia, PA states "This was the worst place I've ever stayed in my life. I've stayed in a lot of Day's Inn that were clean, adequate rooms in a safe neighborhood. As we followed the directions we became apprehensive. When we entered the hotel lobby we knew we had made a mistake when we saw the "bullet proof glass"surrounding the front desk. With our arrival being 4th of July week we felt stuck knowing we could probably not find another room in town at 7 PM. We decided it was better to lock ourselves in a room there than to risk not finding a room elsewhere and having to spend the night in the car. I'll just say that after my one night stay here I'm not sure if I'll ever book Days Inn again! The carpet was soiled. The headboards that were supposed to be bolted to the wall was coming off. We checked out at first light assuming this would be the safest time of day to get out! Prostitutes were hanging around out front and coming in purchasing rooms. Definately not a place for a family!"[54]

- August 2008 Tripadvisor review from a Days Inn in Birmingham, AL states "Saw the website pictures and thought it looked nice and was a good value. So, I booked the room for a week. It was a mistake! It was dirty and had a lot of low life people staying

[53] https://www.tripadvisor.com/Hotel_Review-g32414-d77021-Reviews-Days_Inn_by_Wyndham_Fresno_Central-Fresno_California.html

[54] https://www.tripadvisor.com/Hotel_Review-g60795-d96684-Reviews-or20-Days_Inn_by_Wyndham_Philadelphia_Roosevelt_Boulevard-Philadelphia_Pennsylvania.html

there. Prostitutes, pot heads, and people wandering around all over the place. The pool was a "cess-pool". It stank, and there was a condom wrapper in it. I will NEVER stay there again"[55]

- November 2008 Expedia review from a Days Inn in Nanuet, NY states "The one thing that I will always remember about this hotel was that I had to call the front desk because a very loud and noisey pair of hookers decided to hang out in the hallway next to the exit door (which was unfortunately right near my room) while they waited for a ride to pick them up after their visit to the neighboring hotel room. They were loud and obnoxious after 10 pm while I and my family were trying to sleep. We were on a non-smoking floor and the hookers in the hallway were smoking. When we checked out the next morning we found the hallway littered with their half-eaten pizza slices and crumpled up paper cups. I had to call the front desk to complain about the noise. I don't know if it was a hotel employee or their ride who finally showed up and hustled the call-girls out of the hallway."[56]

- December 2008 Tripadvisor review of a Days Inn in Silver Spring, MD states "This was the worst hotel in my life!" "Both me an my friend are not weedy guys, but we felt unsafe staying there. At around 6pm some black guys kept hovering outside the room, then as it got later some other black guys pulled up in a car outside in the car park and where making lots of noise in there car... then other black guys would go up to the car, and then after a while walk off. Seemed like drug deals where going on in the car park! This is bad because the hotel has absolutely no (ZERO!) security. Members of the public can freely walk in and just go straight to the rooms. It felt very unsafe, so we instantly checked out and made a quick getaway! Later we found a motel 6 which was a little better but at least safer than this hotel. Other people from the area told us that if the locals notice any foreigners then we could be easy targets and they will watch us. Very unsafe. bullet proof glass in the reception, its basically like being in the bronx run down hotel. It seems that its a very cheap hotel, where the criminals, drug dealers, prostitutes use as its cheap. Dangerous for outsiders or foreigners to use. Not recommended at all. Avoid at all costs."[57]

- February 2009 Tripadvisor review of a Days Inn in Miami, FL states "…got to the hotel, which is in a seedy neighborhood. Walked into the lobby and there were six people in front of us trying to check in. There was a HOOKER working in the lobby. There was one person working plus a security guard. It was taking the receptionist 15 minutes to check in one person. We realized it would be an hour and a half to check in, we'd only get to sleep for 2.5 hours, so we got BACK in the shuttle and slept on the floor of the airport, it was that scary. Don't be fooled."[58]

[55] https://www.tripadvisor.com/Hotel_Review-g30375-d73343-Reviews-
Days_Inn_by_Wyndham_Birmingham_West-Birmingham_Alabama.html
[56] https://www.expedia.com/Nyack-Hotels-Days-Inn-By-Wyndham-Nanuet-Spring-Valley.h172075.Hotel-Reviews
[57] https://www.tripadvisor.co.za/Hotel_Review-g41378-d84007-Reviews-or260-
Days_Inn_by_Wyndham_Silver_Spring-Silver_Spring_Montgomery_County_Maryland.html
[58] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-
Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html

- July 2010 Tripadvisor review of a Days Inn in Springfield, MO states "Hotel Staff was very friendly, but when we first went into the room there was trash under the bedskirt and a used condom laying by the night stand…Worst of all there were prostitutes staying down below us, I had to go notify staff, she comented that she wonder if that was why she was staying here and the day before we came back to the hotel from watching my son play ball and 2 women were being arrested on the stairs going up to our room. There were several homeless people hanging around the hotel for 3 of the days. I have stayed in Days Inn before and they were nice but I did not feel safe and the experience was bad so I am not sure I will stay again…"[59]

- August 2010 review from Days Inn in Norfolk, VA states "…There were many people drinking on the upper floor. We were told by a passerby that their son was offered services by prostitutes while on the premises. We left right away. Front desk staff said this hotel is safe but front desk staff will note even allow people to walk into the front desk lobby but rather communicate with people through a little hole on a confined space area about 4 x 7 room prior to entering the front desk lobby giving people a false sense of security. There were many people drinking on the upper floor and loitering. No security staff to enforce any rules. My family was frightened to stay at this inn."[60] The manager of this hotel responded to it on November 19, 2010.

- September 2010 review of a Days Inn in Milwaukee, WI states "…got back about midnight to find a pair of gentlemen bleeding in the main lobby, i later found out that they were there for a bachelor party and had found a couple "working girls" who took them out and then drugged and beat them, and the their pimp did some stuff i dont even want to repeat, regardless to say, i didnt spend the night, i left at about 3 am, checked into a hotel and absolutely would not recomment this hotel, staff and hotel are nice enough. but the manager and location are just not worth dealing with."[61]

- June 2011 Expedia review of a Days Inn in San Jose, CA states "NOT SAFE PLACE TO STAY OR BRING YOUR FAMILY. Nothing was clean, swimming pool was not usable, there were blood stains on the sheets, no customer service.~~Worst of all, there were drug deals there all the time as well I was propositioned for sex as someone thought I "worked there" Please do not stay here if you want to feel safe"[62]

- January 2012 review from a Days Inn in Lawndale, CA states "… it felt super unsafe lie kinda place that hookers, pimps, gens, & drug dealers frequent. … I would never

---

[59] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html

[60] https://www.tripadvisor.com/Hotel_Review-g58026-d110777-Reviews-Days_Inn_by_Wyndham_Norfolk_Military_Circle-Norfolk_Virginia.html

[61] https://www.tripadvisor.com/Hotel_Review-g60097-d1571552-Reviews-Days_Inn_Suites_by_Wyndham_Milwaukee-Milwaukee_Wisconsin.html

[62] https://www.expedia.com/San-Jose-Hotels-Days-Inn-By-Wyndham-San-Jose.h18108.Hotel-Reviews

stay here again. this place is a motel! worth only about $25 a night. its no good unless u just need four walls and bed to sleep in for a night."[63]

- March 2012 review from a Days Inn in New Stanton, PA states "…Sketchy men are inside their truck smoking and hanging out in the parking lot. Men start ogling me and eying me in a creepy, sketchy way and my coach and her husband (both are cops) make a comment about a young woman who is scantly clad and walking with a man in his sixties arm in arm. The son makes a comment that a business transaction was going on and this was a prostitute and a john!" "So, I know that they got rid of my room, because they would rather charge a desperate pervert a higher rate so that he could pay for sex, then an athlete with a lower rate. I argue with the two people at the front desk and get into a shouting match and then five sketchy men stand right near the front desk staring there even after he said that the hotel was booked full…"[64]

- June 2012 review from Das Inn in Atlantic City, NJ states "…when I came back to my hotel I was greeted by to atlantic city prostitutes walking out of the lobby with the european looking fellow. At the lobby the hotel has a $10 per guest policy I suppose as a way of making commissions. Lol. Uuuugh.for the price I paid I should have expected as much and not been as naive but I won't be making that mistake again."[65]

- October 2012 Yelp review of a Days Inn in Sarasota, FL states "Great hotel - if you enjoy being propositioned by prostitutes. Skid row's "finest." A real DUMP."[66]

- January 2013 review of Days Inn in Miami, FL states "Our television didn't work, the walls and tub had stains all over them, and there were hookers and their pimp hanging out waiting for johns on the top floor of the outside rooms overlooking the parking lot. When we complained it was obvious that some of the staff obviously knew what was going on with the prostitution. However the staff we dealt with did try to accomodate us by giving us another room on the inside of the hotel, but it was still filthy."[67] A guest relations manager responded to this review on February 4, 2013.

- March 2013 review of a Days Inn in Monroeville, PA states "jenny calderlore (manager) u are failing at making this hotel a success ur neglect and lack of responsibility has turnd me and buisness partners off we will never use this shack again we areas more then the twobit nite people (prostitutes and drug abusers) that use ur facility i will never consider ur hotel again!"[68]

---

[63] https://www.tripadvisor.ca/Hotel_Review-g32612-d84227-Reviews-Days_Inn_by_Wyndham_Los_Angeles_Lax_Redondo_ManhattanBeach-Lawndale_California.html

[64] https://www.yelp.com/biz/days-inn-by-wyndham-new-stanton-pa-new-stanton

[65] https://www.yelp.com/biz/days-inn-by-wyndham-atlantic-city-oceanfront-boardwalk-atlantic-city

[66] https://www.yelp.com/biz/days-inn-by-wyndham-sarasota-bay-sarasota

[67] https://www.tripadvisor.com/Hotel_Review-g34443-d87080-Reviews-Days_Inn_by_Wyndham_Miami_Airport_North-Miami_Springs_Florida.html

[68]

25

- April 2013 review of a Days Inn in Alexandria, VA states "…Everything is true about the drug activity, prostitutes, across the street is section 8 housing with loud music and lots of "traffic" to one house in particular…Safety is definitely a concern.. I parked my car one night after partying in DC and a bum knocked on my window asking for change. The police have come a few nights driving through the area asking is everything okay. One officer referred to the area as the "problem area"."[69] A guest relations manager responded to this review on April 7, 2013.

- May 2013 review of a Days Inn in Kent, WA states "…During this wait is when we witnessed the worrying stuff. We got the impression that most of the other motel guests lived there. There were guests in and out asking the desk if they had messages who either looked really disheveled or like a prostitute. Some of them knew each other. There was one woman checking in. The employee at the counter told her that if she had any "guests" she would be asked to leave..clearly there was a history. I wrote all this off to my imagination..until a police officer came in. He talked to the staff about their ongoing problems with prostitution and drugs and was offering his help and advice..the staff told him about the people living in their van and car in the parking lot. There were three police cruisers in the parking lot for awhile after that."[70]

- July 2013 review of a Days Inn in Louisville, KY states "I could not believe how bad this place was. The room was nasty, I was afraid to put my 8 month old down! The tub was stained and there were "hairs" in the tub. Not only was the room bad but so was the area..we had prostitutes working from the sidewalk outside our door! We checked out and went to another hotel down the road."[71] The hotel manager responded to this review on July 12, 2013.

- July 2013 review from Days Inn in Corpus Christi, TX states "…I honestly felt that some sort of prostitution was taking place on premises. I can think of no other explanation for the constant activity between midnight and 5:00 a.m. No iron in the room. Hallways smelled like the place had been in a flood. after the first night my son's legs boke out in a rash. The worst hotel experience ive ever had. Definitely not worth $476."[72]

- September 2013 review from a Days Inn in Dallas, TX states "…The hotel is used mainly by prostitutes and drug dealers. It was a last minute decision on my part, due to a change in my work plans. At least I didn't find bed bugs... Wifi only worked in the lobby, false advertising on the hotel's part.... Employees there (front desk clerk and housekeeping) were very unfriendly and not helpful. overall, the worst experience with

---

[69] https://www.tripadvisor.co/Hotel_Review-g30226-d83887-Reviews-Days_Inn_by_Wyndham_Alexandria-Alexandria_Virginia.html

[70] https://www.tripadvisor.com/Hotel_Review-g58537-d216846-Reviews-Quality_Inn_Kent-Kent_Washington.html

[71] https://www.tripadvisor.com/Hotel_Review-g39604-d295278-Reviews-Days_Inn_by_Wyndham_Louisville_Airport_Fair_and_Expo_Center-Louisville_Kentucky.html

[72] https://www.expedia.com/Corpus-Christi-Hotels-Days-Inn-Suites-By-Wyndham-Corpus-Christi-Central.h43249.Hotel-Reviews

a hotel, ever. I'm upset that I paid for such crappy service and room."[73] A guest relations manager responded to this review on September 24, 2013.

- January 2014 review from a Days Inn in Beaumont, TX states "Let's see, moldy smell in room? Check. Mildew around tub? Check. Hastily painted over black mold on the wall? Check. Look on my wife's face when a hooker knocks on the door at 2 AM.? Priceless!"[74]

- February 2014 review from a Days Inn in Saint Paul, MN states "…However, when my companions and myself (three women total) went down to the bar for a drink we were propositioned.I had security remove this man. But within a short period of time he was back again harssing us. I did find out from a family member whom we were visitng that this hotel was busted for a prostitution ring. Well, that was not on the description of the hotel that I read! Had I known this we would have stayed elsewhere."[75]

- April 2014 review of a Days Inn in North Charleston, SC states "…We will NEVER stay here again. The first two nights the people next door argued and yelled half the night. Think a hooker and her pimp because people kept coming in and out all night, ridiculous."[76]

- May 2014 review of a Days Inn in Lanham, MD states "This hotel seems highly trafficked by young adults and/or those using said hotel rooms for sex/prostitution purposes. There was also a lot of screaming and cursing amongst the guests staying at hotel, with very little intervention from night staff."[77]

- July 2014 review of a Days Inn in Columbia, SC states "This place is a dump!! Not a safe place to stay with your family. Hooker's walking around, high speed chase, and drug dealing in front of my room!!! Do Not waste your money!!!"[78]

- July 2014 review of a Days Inn in Savannah, GA states "…Friday night I get woke up by drunk guest in the court yard. 1 am . I go to get something from the car there is 2 prostitutes offering sex for money in the drive way to a group of men getting drunk in the driveway. I decide to get stuff from the vending machines, I couldn't buy a candy bar but you could by condoms…"[79]

---

[73] https://www.tripadvisor.co.nz/Hotel_Review-g55711-d109479-r368180294-Days_Inn_Suites_by_Wyndham_Dallas-Dallas_Texas.html

[75] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Quality-Inn-St-Paul-Minneapolis-Midway.h20646.Hotel-Reviews

[76] https://www.expedia.com/Charleston-Hotels-Days-Inn-Suites-By-Wyndham-Charleston-Airport-West.h11774.Hotel-Reviews

[77] https://www.tripadvisor.com/Hotel_Review-g41222-d217008-Reviews-Days_Inn_by_Wyndham_Lanham_Washington_D_C-Lanham_Maryland.html

[78] https://www.yelp.com/biz/days-inn-and-suites-by-wyndham-se-columbia-ft-jackson-columbia

[79] https://www.tripadvisor.com/Hotel_Review-g60814-d89795-Reviews-or660-Days_Inn_Suites_by_Wyndham_Savannah_Gateway_I_95_and_204-Savannah_Georgia.html

September 2014 review of a Days Inn in Springfield, MO states "Worse hotel ever the room smelt like dirty feet, drug deal in the parking lot. A hooker trying to get my son to come to her room people knocking at your door all hours of the night. Then they took an $101 for charges and told me the room smelt like cigarettes.I dont smoke. So now I'm fighting with corporate office to get back my $101."[80] The hotel manager responded to this review on October 20, 2014.

- February 2015 review of a Days Inn in Alexandria, VA states "…Also when I was checking out, there was a lady who seemed to be a prostitute as she was wearing tight pants, and she checked in in the afternoon and checked out at night and didn't want her security deposit. Very shady area…"[81]

- March 2015 review of a Days Inn in Monroeville, PA states "In town for my mothers funeral. Hotel had prostitutes solicit my husband on elevator, rotten apples on breakfast bar, dirty rooms, poor internet connection, bad customer service. Overall terrible experience and waste of money. Stay at the RED ROOF INN down the street."[82] The hotel manager responded to this review on March 9, 2015.

- April 2015 review of a Days Inn in Pinole, CA states "…while I was sitting and eating I notices a local hooker walk in and ask the clerk to call a room for her, she had a conversation with the person staying there ( a customer who changed their mine) then she had the some one to pick her up from the front desk office phone. never again I repeat."[83]

- July 2015 review of a Days Inn in Philadelphia, PA entitled "WEED, PROSTITUES, AND THE HOMELESS DERELICS" states "there were prostitutes, drug addicts and dealers who frequented the building during my THREE DAY STAY, our neighbors across the hall had a party every night with different guests each night and were loud as heck, there was a strong odor of marijuana coming from almost every room on the second floor, the security guard sits in the lobby and only walks the floors every so often when he isn't sleep in the chairs and even though he can definitely smell the marijuana, he says and does NOTHING.!!!!"[84] The guest relations manager responded to this review on July 31, 2015.

---

[80] https://www.tripadvisor.com/Hotel_Review-g44926-d243908-Reviews-Days_Inn_Suites_by_Wyndham_Springfield_on_I_44-Springfield_Missouri.html
[81] https://www.tripadvisor.co/Hotel_Review-g30226-d83887-Reviews-Days_Inn_by_Wyndham_Alexandria-Alexandria_Virginia.html
[82] https://www.tripadvisor.com/Hotel_Review-g53223-d20224435-Reviews-or270-Rodeway_Inn_Suites_Monroeville_Pittsburgh-Monroeville_Pennsylvania.html
[83] https://www.expedia.com/Concord-Hotels-Days-Inn-By-Wyndham-Pinole-Berkeley.h41602.Hotel-Reviews
[84] https://www.tripadvisor.com/Hotel_Review-g60795-d96684-Reviews-or20-Days_Inn_by_Wyndham_Philadelphia_Roosevelt_Boulevard-Philadelphia_Pennsylvania.html

- November 2016 review of a Days Inn in Atlantic City, NJ states "…Upon arrival you could see the hotel was out dated and either the employees or guests where smoking weed due to the lobby reeking of it. once we got up to our floor the smell of weed was overwhelming and the hallways were smokey…the tv had what we presumed was Vaseline smeared on the buttons so we refused to touch it or use it…while i was down stairs i asked the front desk if our floor was a smoking floor. he told us no but you can smoke on the balcony. i informed him the floor we where on was filled with smoke and the smell of weed. he told us to tuck towels under the door and that people smoke on the balcony and the smoke comes inside. i told him we already did and this is more than a "little" smoke. he then told us if we dont like it we can go someplace else with a smirk on his face.when we got back to our room there was a women screaming and yelling at a guy in the next room to pay her for her "services". i didn't bother to call the front desk seeing as how they dont care people do drugs in their hotel im sure they dont care a hookers yelling at her john. Lastly when leaving the hotel we got in our car and the rude desk clerk that told us to go someplace else got out of his car and stared me and my girlfriend down shaking his head still with that smirk on his face. My advise for anyone planning on staying here is DO YOUR RESEARCH and be sure to document whats in the room before and after you leave. this hotel seems to harbor drug users and prostitution so be advised if you are bringing children here."[85]

- January 2017 review of a Days Inn in Beaumont, TX states "Stay was horrible rooms were some what clean how ever I had drug deals being done out side room could hear every word being said outside my door and the local hookers knocked on door twice that night as well as the tenants up stairs throwing sledge hammers off the balcony into the parking lot as a challenge of some sort"[86] The general manager of the hotel responded to this review on January 8, 2017.

- February 2017 review of a Days Inn in Reynoldsburg, OH states "There was the smell of marijuana in the halls on a daily basis and office was informed and yet it still continued as with the prostitution"[87]

- April 2018 review of a Days Inn in Albuquerque, NM states "Prostitutes were screaming the same script of seriously gross stuff every 45 minutes. I don't know if I've been as scared as I was that night.. the cops finally came at 4AM, but as soon as they left, it was full steam ahead again. Never stay here, the owning company Wyndham Hotel Group responded to me by saying they appreciate feedback. Nothing is going to change until someone holds them accountable."[88]

---

[85] https://www.tripadvisor.co/Hotel_Review-g29750-d92281-Reviews-
Days_Inn_by_Wyndham_Atlantic_City_Oceanfront_Boardwalk-Atlantic_City_New_Jersey.html
[86] https://www.tripadvisor.com/Hotel_Review-g60737-d483228-Reviews-Days_Inn_by_Wyndham_Beaumont-
Beaumont_Texas.html
[87] https://www.tripadvisor.com/Hotel_Review-g50891-d75114-Reviews-
Days_Inn_Suites_by_Wyndham_Columbus_East_Airport-Reynoldsburg_Ohio.html
[88] https://www.yelp.com/biz/days-inn-by-wyndham-midtown-abq-albuquerque?start=80

- August 2018 review of a Days Inn in Antioch, CA states "Drug dealers talking on the phone in pool area, hookers being dropped off and picked up, tweekers rummaging through cars. Had to keep my kids in the room the whole time. No orange juice, or milk for " breakfast". Horrible."[89]

- January 2019 review of a Days Inn in Birmingham, AL states "The hotel was not in a great location and also where my room was located a lot of prostitution was taking place"[90] The hotel manager responded on February 2, 2019 stating "…We respect each guest therefore, we do regret that the ambiance or the other guests were not according to your preferences, but we honor them all and value each of them…"

- May 2019 review of a Days Inn in Greenville, SC states "Worst place ever the manager is rude. The rooms are nasty. I will bever stsy here again there are hookers all over and the staff dont care. There are ppl doing drugs right out in the open. Ppl selling drugs right out in the open. I had my kids here will never stay st this place agsin"[91] The general manager of the hotel responded to this review on May 13, 2019.

- An August 2008 review of a Super 8 property in Arizona stated: "Woke in middle of night (2:30am) with loud party on 2nd floor with bodies slamming into walls, and looked out window to see hooker and pimp making deal with another man in pickup in the parking lot."[92]

- A January 2010 review of a Super 8 property in Escondido, California stated: "This is a hooker hangout, doors slaming at 3:00 AM, You will hear pimps on their cellphones outside in the middle of the night. Ladies arriving at 4:00 AM, Management MUST be aware this is going on and condone this. I expected John Walsh to show up with a film crew."[93]

- A February 2010 review of a Super 8 property in Los Angeles, California stated: "This place lacks security and there were drug dealers trying to push their products inside of the hotel. This place is Scary. The neighborhood was frightening and there were also prostitutes and homeless/addicts all over the place and renting rooms in the hotel. The desk guy looked at my friends attire (faux fur coat) and assumed he was a pimp and that we were prostitutes and seemed surprised that we had made reservations for more than one night. He kept giving us this strange smile... icky. This place left me with a bad feeling. If you want to stay here to save a few bucks my advice is to utilize the buddy system whenever you leave your room to visit the vending machines... after checking in for the night that is probably the only thing you will feel even moderately

---

[89] https://www.expedia.com/Concord-Hotels-Days-Inn-Suites-By-Wyndham-Antioch.h1195456.Hotel-Reviews

[90] https://www.expedia.com/Birmingham-Hotels-Days-Inn-By-Wyndham-BirminghamWest.h14316.Hotel-Reviews

[91] https://www.tripadvisor.com/Hotel_Review-g54258-d223932-Reviews-Days_Inn_by_Wyndham_Greenville-Greenville_South_Carolina.html

[92] https://www.tripadvisor.co/Hotel_Review-g60950-d74409-Reviews-Super_8_by_Wyndham_Tucson_Downtown_Convention_Center-Tucson_Arizona.html

[93] https://www.tripadvisor.com/Hotel_Review-g32358-d235407-i132418454-Super_8_Escondido-Escondido_California.html

safe doing. eek. I can deal with scary hotels but this place is a disaster waiting to happen."[94]

- A June 2010 review of a Super 8 property in Virginia stated: "The location is in a very unsafe place. There were junkies and prostitutes using the premises of the hotel."[95]

- A July 2010 review of a Super 8 property in Texas stated: "After a night out parking lot full had to park under drive thur in front of hotel no other space. Number One reason to not stay here HOOKERS!!! walking the parking lot, walking the sidewalks and feeder road roads in front of Motel. All hours of the day."[96]

- An October 2011 review of a Super 8 property in Tennessee stated: "Don't stay here unless you want drugs or a prostitute....or both. There were drunks running up the halls all night and the maid offered to have sex with my husband for money. When he refused, she then offered to sell him pills."[97]

- A February 2012 review of a Super 8 property in Florida stated: "This hotel should not even be listed as a choice to stay in. Upon check, 3 rooms from me was a sexual battery crime scene. Prostitutes and drug deals were going on all over the property. The room was filthy, smelled horrible and I wouldn't even touch the bed! This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!! DO NOT STAY HERE!!"[98]

- An April 2012 review of a Super 8 property in Virginia stated: "Just beware, there are "escorts" who are constantly on the lookout for fresh meet. A pimp will knock on your door asking to use your cell to call his girlfriend. From then on, she will do the work."[99]

- An April 2012 review of a Super 8 property in Texas stated: "We have stayed in hotels all over the world and I have never had as terrible and frightening an experience as I had at this hotel. The place was crawling with prostitutes and seedy looking guys looking for prostitutes. We tried to stay here anyway, but the night manager started threatening us! In the end we had to call the police in order to safely leave. The police were very sympathetic, and apparently they have frequent problems with this hotel. Stay Away."[100]

---

[94] https://www.tripadvisor.com/Hotel_Review-g32655-d235134-Reviews-Super_8_by_Wyndham_Hollywood_La_Area-Los_Angeles_California.html
[95] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-NorfolkChesapeake-Bay.h7202.Hotel-Reviews
[96] https://www.tripadvisor.com/Hotel_Review-g30196-d109015-Reviews-Super_8_by_Wyndham_Austin_North_University_Area-Austin_Texas.html
[97] https://www.tripadvisor.com/Hotel_Review-g55138-d97967-Reviews-or165-Super_8_by_Wyndham_Knoxville_Downtown_Area-Knoxville_Tennessee.html
[98] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html
[99] https://www.expedia.com/Manassas-Hotels-Super-8-By-Wyndham-Manassas.h12141.Hotel-Reviews
[100] https://www.tripadvisor.ca/Hotel_Review-g56003-d240483-Reviews-Super_8_by_Wyndham_Houston_Brookhollow_NW-Houston_Texas.html

- An October 2012 review of a Super 8 property in Florida stated: "the last time i stayed at this super 8, a hooker approached me in the parking lot and i informed you . this time there was a drug dealer in the next door room, cars coming and going all day & night a car would pull up and one person goes inside and 5 minutes later comes out. when i was checking out i told the desk clerk and the girl in the office says oh i know who that is. well if you knew about why was he still there. i will never stay there again, and i'm a loyal super 8 customer."[101]

- A March 2013 review of a Super 8 property in Louisiana stated: "There was a PROSTITUTE running her business from a room, with her pimp standing outside. She propositioned a co-worker as he was going to his room. Then in the middle of the night she and her clients were fighting very loudly over money and services issued!"[102]

- A March 2013 review of a Super 8 property in Ohio stated: "I've been solicited for drugs and by prostitutes here on several occassions. I told the hotel staff about it and they seem to turn a blind eye to the problem because these people are also buying rooms."[103]

- A February 2013 review of a Super 8 property in Minnesota stated: "This hotel was disgusting. Homeless man passed out in lobby, possible prostitute hanging out in hallway with pimp, cigarette smell, ridiculous noise level throughout night, etc. Dirty shoes in microwave, empty beer cans in fridge. I cannot express enough how terrible this place really is."[104]

- An April 2013 review of a Super 8 property in Georgia stated: "The hotel was filled with prostitutes and drug dealers and I was put in the back with my children which gave me no type of security. Super 8 needs to remove their name from this building."[105]

- A July 2013 review of a Super 8 property in California stated: "Our first night we were greeted by undercover police busting the prostitutes using the spare rooms to turn tricks. Maids make extra income unlocking vacant rooms. I would not recommend this place for children.Or anyone for that fact."[106]

---

[101] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html

[102] https://www.tripadvisor.ca/Hotel_Review-g40314-d120851-Reviews-FairBridge_Inn_Express_Metairie-Metairie_Louisiana.html

[103] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html

[104] https://www.tripadvisor.com/Hotel_Review-g43493-d247863-Reviews-Super_8_by_Wyndham_St_Cloud-Saint_Cloud_Minnesota.html

[105] https://www.tripadvisor.com/Hotel_Review-g34856-d217054-Reviews-Super_8_by_Wyndham_Atlanta_Hartsfield_Jackson_Airport-College_Park_Georgia.html

[106] https://www.tripadvisor.com/Hotel_Review-g32655-d252254-Reviews-or50-Super_8_by_Wyndham_Canoga_Park-Los_Angeles_California.html

- An August 2013 review of a Super 8 property in Ohio stated: "This hotel gives the Super 8 chain a bad reputation. The local restaurant management told us not to answer door due to prostitution issues."[107]

- An October 2013 review of a Super 8 property in Virginia stated: "We ended up wedging a pole in the door for safety reasons. After dark the place turned into, I do NOT exaggerate, a open hoer house. At lease 4 pimps were doing business with a dozen or so girls there. If not for the safety reasons it was a life experience seeing that side of society. We were surprised at a chain like Super 8 condoning this activity. . . . The big thing was the blatant open prostitution that was condoned by your chain was despicable. The car music blaring and loud laughing and yelling was just like out of a rap video. Shame on you Super 8 for condoning this kind of activity just to fill a room."[108]

68.     These reviews are limited representative examples. There are many similar online reviews for Days Inn and Super 8 branded hotels, and, on information and belief, there are additional similar reviews and other customer complaints from before Plaintiff's trafficking period that are not currently available on the internet but which the Wyndham Brand Defendants know about.

69.     Public statements confirm that the Wyndham Brand Defendants knew sex trafficking was a problem at Wyndham branded hotels and that they retained control over the response of Wyndham branded hotels to sex trafficking. Wyndham has recognized its "critical role in increasing awareness and prevention" of sex trafficking in their hotels.[109] The Wyndham brand has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[110]

70.     Unfortunately, while these statements reflect actual knowledge of the problem of sex trafficking at their branded hotels, they reflect only a public relations strategy rather than a

---

[107] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html

[108] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html

[109] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

[110] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

genuine commitment to stop facilitating trafficking and to stop receiving benefits from that trafficking. Wyndham has refused to publish reports to show its progress, or lack thereof, on the EPCAT goals to combat sex trafficking in its hotels.[111] Emails among company executives of the Wyndham Brand Defendants reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[112]

71. News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time Jane Doe Jane Doe (T.S.) was trafficked at the Maplewood Days Inn, the Wyndham Brand Defendants knew or should have known:

a. The use of Wyndham branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

b. Commercial sex work occurring at Wyndham branded properties involved trafficking and compelled prostitution;

c. Wyndham franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at Wyndham hotel properties;

d. Their efforts, if any, to stop facilitating sex trafficking in Wyndham branded properties were not effective; and

e. They were, by their acts and omissions, facilitating sex trafficking at Wyndham branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

72. Despite the continually mounting evidence that sex trafficking at Wyndham branded properties was ongoing and growing, the Wyndham Brand Defendants did not change

---

[111] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023

[112] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

34

course. The Wyndham Brand Defendants chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking.

## IV. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Wyndham Hotels.

73. At all relevant times, Defendants also knew or should have known that sex trafficking was prevalent at the Maplewood Days Inn, the St. Paul Super 8 and Brooklyn Center Super 8 (collectively "the Subject Wyndham Hotels") specifically because there was widespread sex trafficking on site that followed well-established patterns and presented with obvious signs that Defendants knew and acknowledged to be indicators of sex trafficking in a hotel environment.

74. Defendants knew that the Subject Wyndham Hotels were located in high-crime areas with a high incidence of sex trafficking and related criminal activity. Domestic sex trafficking, and particularly the role of hotels sex trafficking, was a well-recognized problem in this area long before Jane Doe (T.S.)'s trafficking occurred. The City of St. Paul established the Gerald D. Vick Human Trafficking Task Force in 2005. And Minnesota Statewide Human Trafficking Task Force was established by state legislation, MN Statute §299A.79, in 2006.

75. By 2012, it was known that in Ramsey County many cases of child sex trafficking were starting online and ending up in local hotels, with teenage runways especially susceptible to becoming ensnared—the very pattern Jane Doe (T.S.)'s trafficking followed.[113] Area law enforcement recognized that hotels were the "front line" for sex trafficking and, by 2012, hotels in Ramsey County—where the Maplewood Days Inn and St. Paul Super 8 were located—were receiving training from law enforcement on detecting sex trafficking.[114] In 2013, the Minnesota Lodging Association partnered with law enforcement in developing video training for hotels on

---

[113] https://www.cbsnews.com/minnesota/news/authorities-hotels-team-up-to-fight-sex-trafficking-in-ramsey-co/
[114] https://www.mprnews.org/story/2013/01/08/police-enlist-hotels-in-fight-against-sex-trafficking

sex trafficking and to create and distribute posters to educate hotel staff on how to detect and respond to sex trafficking.[115] Prior to Jane Doe (T.S.)'s trafficking, Minneapolis police Sgt. Grant Snyder recognized "Nobody is better at recognizing problems in their hotel. Recognizing when something's amiss, when someone needs help or when someone's in danger. No one's better at that than hotel employees."[116]

76.    Although the number of reviews currently available online is limited because the Maplewood Days Inn was permanently closed shortly after the trafficking of Jane Doe (T.S.), the few that remain available confirm the presence of criminal activity associated with sex trafficking at the Maplewood Days Inn. For example:

- A Google review from in or around 2013 states: "Next, the place is dirty, and sketchy. The word sketchy came out of my 12 year old daughter's mouth, before I even said anything. You know that's bad. Next, the rooms are run down. The carpets are dirty. The sheets are stained. We had 2 rooms, they both were horrible in the cleanliness respect. The towels were old & frayed. The bathtub had mold on it. It was just disgusting. The vending machines were empty, except on the bottom floor, which was stocked with...condoms. That speaks volumes about the clientele they expect here. I wish I would have seen it in time. Due to a big event, pretty much every other place in the area was booked, otherwise we would have left immediately. The walls are paper thin, you can hear pretty much everything from every room on the floor. One of the doors to the room didn't close until you slammed it 2 or 3 times. The room next to mine contained at least 5 or 6 people, and there was clearly a party going on until all hours of the night. There were people fighting outside. The place REEKED of weed. There were clearly people who resided there. When I brought all of this to the attention of the attendant upon check out, I was given a coupon for 15% off of my next stay, even though I informed them that I have NO intentions of EVER EVER EVER returning there again."[117]

- A Google review from in or around 2013 states: "Stay very far away. This is the worst hotel I've ever stayed at, and I've visited 3rd world countries. I REALLY wish I was

---

[115] https://humanrightssociety.org/2013/10/29/video-aims-to-train-hotel-staff-to-id-sex-trafficking/
[116] 116 https://www.mprnews.org/story/2013/01/08/police-enlist-hotels-in-fight-against-sex-trafficking
[117] https://www.google.com/travel/search?q=maplewood%20minnesota%20days%20inn&g2lb=4965990%2C723170 59%2C72414906%2C72471280%2C72472051%2C72485658%2C72560029%2C72573224%2C72601601%2C726 16120%2C72647020%2C72686036%2C72803964%2C72882230%2C72958624%2C72959983%2C73059275%2C 73064764%2C73107089%2C73127085%2C73148426&hl=en-US&gl=us&ssta=1&ts=CAEaKwopEicyJTB4NTJiMmQzZmY5MmY2ZWIxYjoweGNmM2I0ODczY2IyZGEyN WM&qs=CAEyFENnc0kzTVMyMmJ5TzBwM1BBUkFCOAI&ap=ugEHcmV2aWV3cw&ictx=111&ved=0CAA Q5JsGahcKEwjwiZaUrceQAxUAAAAAHQAAAAAQBA

exaggerating. . . .Every exterior lock on the building was broken, and the place was a haven for prostitutes and god knows what else. Best part about the experience was leaving."[118]

77.    Online reviews for the St. Paul Super 8 also reflect obvious indicia of criminal activity linked to sex trafficking:

- A 2010 TripAdvisor review states: "The security door to the outside was broken, mgmt has told me this will be fixed in the future. Security failure allows people to enter from the back parking lot into the hotel and enter the second floor without passing the front desk. This problem is exacerbated by the fact that people live in this hotel and I witnessed what looked to be a meth-head blow in by this door."[119]

- A 2011 TripAdvisor review states: "Another thing was the fact that the area seemed quite unfavorable. There were sketchy characters roaming around and the back door remained propped open because it didn't shut properly on it's own. This is highly unsafe and anyone could walk in through the back at any given moment."[120]

- A 2011 review states" The night we stayed there, some sort of domestic violence went down in the parking lot. I went to the front desk to ask if I could get a comb for my girlfriend, but no one was there. Next thing I know, a kid comes running in and said "he's [the front desk guy] dealing with a bad situation. There's a lady getting choked in the parking lot." I preceded to go back to my room, and dead bolt the door. I watched out the window a bit and saw a few police cars come a figure the situation out."[121]

- A 2011 TripAdvisor review states: "However, this place was 'home' to some unsavoury characters. The area outside the lobby was populated with people who were sitting, swearing, smoking, and spitting. My son and I had to walk the gauntlet through this crowd to get to the entrance and to check in"[122]

- A 2012 TripAdvisor review states: "Wow sums up my experience at this hotel. Hookers and drug users can be found in hallways."[123]

---

[118] *Id.*
[119] https://www.tripadvisor.com/Hotel_Review-g43501-d90507-Reviews-Motel_6_St_Paul_I_94-Saint_Paul_Minnesota.html
[120] *Id.*
[121] https://www.tripadvisor.com/Hotel_Review-g43501-d90507-Reviews-Motel_6_St_Paul_I_94-Saint_Paul_Minnesota.html
[122] *Id.*
[123] *Id.*

- A 2012 TripAdvisor review states: "When first arriving, no fewer than 5 cops were already in front of the hotel. It could easily be mistaken for a jailhouse. The majority of customers looked like drug users. . . .The room was a complete turn off, and the environment felt very unsafe."[124]

- A 2012 TripAdvisor review states: "I stayed one night and didn't feel safe. The clientele was shady, it looked like people were doing drug deals or just having one night stands in their rooms."[125]

- A 2012 TripAdvisor review states: "We thought we would be ok staying here. Boy were we surprised ! We walked into a lobby full of hookers and pimps. We went to our room to find other people's clothes left in the room."[126]

- A 2013 TripAdvisor review states: "This is a crack-head motel. I've never been so afraid. Very run-down. But the room seemed clean and desk person was nice and accommodating. Sketchy parking lot lobby and hallway people. Cheap and worth the price. Do not stay here unless you have ur posse and lots of drugs."[127]

- A 2013 TripAdvisor review states: "It was cheap and old, and we don't spend much time in our room at any motel, but any time of day there were thugs and hookers,and panhandlers every time we went to the front desk."[128]

- A Google review from in or around 2014 states: "Patrons smoking, drinking and fighting in the parking lot as we drove up, should have driven away then but we were using points to pay so continued to check in."[129]

---

[124] *Id.*

[125]  *Id.*

[126] https://www.tripadvisor.com/Hotel_Review-g43501-d90507-Reviews-Motel_6_St_Paul_I_94-Saint_Paul_Minnesota.html

[127] *Id.*

[128] https://www.tripadvisor.com/Hotel_Review-g43501-d90507-Reviews-Motel_6_St_Paul_I_94-Saint_Paul_Minnesota.html

[129]https://www.google.com/travel/search?q=Super%208%201739%20Old%20Hudson%20Rd%2C%20St%20Paul%2C%20MN%2055106&g2lb=4965990%2C72317059%2C72414906%2C72471280%2C72485658%2C72560029%2C72573224%2C72601601%2C72647020%2C72686036%2C72803964%2C72882230%2C72958624%2C73059275%2C73064764%2C73107089%2C73148426%2C73157411%2C73198319&hl=en-US&gl=us&ssta=1&ts=CAEaKwopEicyJTB4ODdmN2Q1ZmE4NWVjMmNkMToweGNiYzVkMzc2N2Q1ODRhNTI&qs=CAEyFENnc0kwcFRoNnVmdTlPTExBUkFCCOAI&ap=ugEHcmV2aWV3cw&ictx=111&ved=0CAAQ5JsGahcKEwjwrM_N-_mQAxUAAAAAHQAAAAQBw

38

- A Google review from in or around 2014 states "marijuana smell throughout 3 -fls. outdated tv poor picture/remote didn't work, police surround permises for hrs. all nite traffic."[130]

78.    The Wyndham Brand Defendants and SHI knew that sex trafficking was prevalent at the Brooklyn Center Super 8 based on online reviews that reflected indicia of sex trafficking and related criminal activity. For example:

- A June 2012 review for the Brooklyn Center Super 8 noted: "the majority of clientele was hookers, pimps and drug dealers. I will never be back. Anybody that brings kids to this dump, should be prosecuted."[131]

- A July 2012 review for the Brooklyn Center Super 8 noted: "Drugs, Prostitution need I say more. This Location should not be associated with Hotels.com. I never review, this was truly a bad experience."[132]

- An August 2013 review for the Brooklyn Center Super 8 noted: "This place was terrible, we were supposed to stay there for 2 nights for a softball tournament turned into a nightmare and we left after the firt night. When we arrived and went to out room the place stunk and the floors were filthy, lots of people walking around parking lot at night. Walking thru hallway we saw a used condom laying in hall and told front desk man who replied "yes I know but I don't have anyone here to pick it up" . Still have not got refund for the 2 nights because we left after one, Beware."[133]

- A January 2014 review for the Brooklyn Center Super 8 noted: "Yelling and arguing in the hallways all night long. Night clerk would just walk by pretending he couldn't hear them. Small kids walking unleashed pit bulls at 3:30am. Open drug use. Lots of condoms in parking lot. Just a nightmare. While I stay at super 8 hotels frequently I will avoid this one forever."[134]

- A May 2014 review for the Brooklyn Center Super 8 noted: "One of the worst Motels I've ever stayed in. Not many places I stay where I feel the need to sleep with my pistol under the pillow but this was one. Carpet was filthy and AC unit had not worked in years. Hookers and drug dealers roamed the halls."[135]

---

[130] *Id.*

[131] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Super-8-By-Wyndham-Brooklyn-CenterMPLS.h124015.Hotel-Reviews

[132] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Super-8-By-Wyndham-Brooklyn-CenterMPLS.h124015.Hotel-Reviews

[133] https://www.tripadvisor.com/Hotel_Review-g42900-d123409-Reviews-Super_8_by_Wyndham_Brooklyn_Center_Mpls-Brooklyn_Center_Minnesota.html

[134] https://www.tripadvisor.com/Hotel_Review-g42900-d123409-Reviews-Super_8_by_Wyndham_Brooklyn_Center_Mpls-Brooklyn_Center_Minnesota.html

[135] https://www.tripadvisor.com/Hotel_Review-g42900-d123409-Reviews-Super_8_by_Wyndham_Brooklyn_Center_Mpls-Brooklyn_Center_Minnesota.html

- A July 2014 review for the Brooklyn Center Super 8 was left by a guest who reported experiencing "dope dealers trying to sell me their product in hallways and got a gentle knock on door from hotel hooker asking if I needed company."[136]

- A July 2015 review for the Brooklyn Center Super 8 noted: "lots of prostitution and loud people through out the night."[137]

- A July 2015 review for the Brooklyn Center Super 8 noted: "I did not feel safe staying at this hotel. This was the first time I've been required to sign a waiver checking in, to the effect that "Illegal activities are not tolerated, and you will be evicted". I was harassed by prostitutes, following me and begging for money. There were people slamming doors and arguing in the hallway all night. Shady characters hanging around the parking lot all night. Police are called frequently. I will not stay here again!"[138]

- A September 2015 review for the Brooklyn Center Super 8 noted: "Hotel in a sketchy part of town. Arrived to several police cars responding to a domestic violence call. In the lobby, the place smelled like weed, and the other hotel guests looked rather suspect. OK, like hookers, they looked like hookers. We asked Zack the front desk clerk if having the police there was a common occurrence and he said, "its been a while, at least a month." On that note we left and found another hotel."[139]

- A November 2017 review from a guest who reported living at the Brooklyn Center Super 8 for months noted: "It's the worst place I've ever been at I'm afraid of the other guests I've seen prostitutes and drug dealers openly walking around selling drugs and their hookers. . . . I believe the staff buys prostitutes and drugs from the guests."[140]

- A December 2017 review for the Brooklyn Center Super 8 noted: "With all the drugs, prostitution and violence at this hotel I was scared to leave my children's side."[141]

- An August 2018 review for the Brooklyn Center Super 8 noted "This place is absolutely horrible. Drug addicts, prostitution, pimps, people selling stolen merchandise in the parking lot. Do yourself a favor and stay away. The staff will lie to your face and say nothing is wrong with their hotel."[142]

---

[136] https://www.tripadvisor.com/Hotel_Review-g42900-d123409-Reviews-Super_8_by_Wyndham_Brooklyn_Center_Mpls-Brooklyn_Center_Minnesota.html
[137] https://www.tripadvisor.com/Hotel_Review-g42900-d123409-Reviews-Super_8_by_Wyndham_Brooklyn_Center_Mpls-Brooklyn_Center_Minnesota.html
[138] https://www.tripadvisor.com/Hotel_Review-g42900-d123409-Reviews-Super_8_by_Wyndham_Brooklyn_Center_Mpls-Brooklyn_Center_Minnesota.html
[139] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Super-8-By-Wyndham-Brooklyn-CenterMPLS.h124015.Hotel-Reviews
[140] https://www.tripadvisor.com/Hotel_Review-g42900-d123409-Reviews-Super_8_by_Wyndham_Brooklyn_Center_Mpls-Brooklyn_Center_Minnesota.html
[141] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Super-8-By-Wyndham-Brooklyn-CenterMPLS.h124015.Hotel-Reviews
[142] https://www.tripadvisor.com/Hotel_Review-g42900-d123409-Reviews-Super_8_by_Wyndham_Brooklyn_Center_Mpls-Brooklyn_Center_Minnesota.html

- A 2018 review for the Brooklyn Center Super 8 noted: "I would be very leary of staying here. especially if coming with a family. It seemed more like a homeless shelter with people hanging out in the parking lot, the front desk, and hallways. There was also a strong smell of weed in the hallway. When I interacted with the front desk staff, they always appeared like they didn't want to talk. I felt scared leaving in the evening to eat dinner with several people hanging out in their cars in the lot. Yes, they did redo the rooms, but my safety is more important." [143]

79.    In 2012, the Maplewood Days Inn was being used by law enforcement in sting operations, which is indicative that the hotel is a known location for prostitution and trafficking.[144]

80.    On information and belief, prior to Jane Doe (T.S.)'s trafficking period, the Wyndham Brand Defendants SHI and Super 8 Franchisee knew about prior instances of sex trafficking at the St. Paul Super 8, including trafficking of a 16 year-old minor and an 18 year-old female that led to a June 2012 criminal complaint.[145]

81.    Jane Doe (T.S.) was aware that her traffickers used the Maplewood Days Inn and St. Paul Super 8 to traffic other minor victims, including when she was present at the hotel and at other times. She also observed signs of other commercial sex and the presence of other pimps at these hotels.

82.    On information and belief, the Maplewood Days Inn was permanently closed in or around 2014. When the property was being sold, it was described as a "failing"[146] hotel and a "dump" by members of the City Council and Maplewood Planning Commission.

83.    All knowledge from the staff at the Maplewood Days Inn is imputed to the Days Inn Franchisee who thus knew about or was willfully blind to the trafficking at the Maplewood Days Inn based on the direct observation of hotel staff, including management-level staff. This

---

[143] https://www.yelp.com/biz/super-8-by-wyndham-brooklyn-center-mpls-brooklyn-center
[144] Chris Serres, Rape Victim's Attacker Had Illicit History, Star Tribune (Minneapolis, MN), Feb. 3, 2017, at 1A.
[145] https://www.southernminn.com/northfield_news/news/northfield-man-one-of-two-sentenced-for-sextrafficking/article_3a352773-79f1-5789-9483-851bbbfb4a50.html
[146] Voge, Adam, "Odd pairing in Maplewood: Senior rentals near Myth club," *Finance & Commerce* (Minneapolis), Nov. 18, 2014

41

knowledge is imputed to the Wyndham Brand Defendants based on the existence of an agency relationship as described below.

84.    All knowledge from the staff at the St. Paul Super 8 is imputed to the Super 8 Franchisee who thus knew about or was willfully blind to the trafficking at the St. Paul Super 8 based on the direct observation of hotel staff, including management-level staff. This knowledge is imputed to the Wyndham Brand Defendants based on the existence of an agency relationship as described below.

85.    All knowledge from the staff at the Brooklyn Center Super 8 is imputed to SHI who thus knew about or was willfully blind to the trafficking at the Brooklyn Center Super 8 based on the direct observation of hotel staff, including management-level staff. This knowledge is imputed to the Wyndham Brand Defendants based on the existence of an agency relationship as described below.

86.    The Days Inn Franchisee, SHI and Super 8 Franchisee also knew or should have known about the sex trafficking at their respective hotels based on:

     a.  surveillance of the property;

     b.  internal investigations;

     c.  customer complaints;

     d.  monitoring of customer feedback;

     e.  information received from law enforcement;

     f.  and other sources of non-public information available to Franchisee.

87.    The Wyndham Brand Defendants also knew or should have known about the trafficking at the Maplewood Days Inn, St. Paul Super 8 and Brooklyn Center Super 8 based on:

     a.  The obligation of hotel staff and Wyndham Brand Franchisees to report suspected criminal activity, including sex trafficking, to the Wyndham Brand Defendants;

42

b.  The Wyndham Brand Defendants' regular monitoring of online reviews;

c.  The Wyndham Brand Defendants' collection and monitoring of customer surveys and complaints;

d.  The Wyndham Brand Defendants' requirement that Wyndham Brand Franchisees submit regular and detailed reports to the Wyndham Brand Defendants about day-to-day hotel operations;

e.  The Wyndham Brand Defendants' collection and monitoring of data about guests at the Maplewood Days Inn, St. Paul Super 8 and Brooklyn Center Super 8 including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f.  The Wyndham Brand Defendants' supervision and control over day-to-day operations of the Maplewood Days Inn, St. Paul Super 8 and Brooklyn Center Super 8 through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisee to use and through which franchisee was obligated to allow the Wyndham Brand Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g.  The Wyndham Brand Defendants' regular inspections of the Maplewood Days Inn, St. Paul Super 8 and Brooklyn Center Super 8;

h.  The Wyndham Brand Defendants' employment of "field agents" to work with hotels on security issues, including trafficking issues;

i.  The Wyndham Brand Defendants' access to surveillance and security systems;

j.  Information provided to the Wyndham Brand Defendants by law enforcement; and

k.  Other sources of information available to the Wyndham Brand Defendants.

88.  The Wyndham Brand Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the Subject Wyndham Hotels based on their supervision and monitoring of the property. As a result, the Wyndham Brand Defendants knew or should have known that the Subject Wyndham Hotels were facilitating widespread sex trafficking.

89.  On information and belief, Days Inn Franchisee, directly or through other entities subject to their control, owned and operated other Wyndham brand hotels in the greater Twin

43

Cities area that also experienced significant problems with sex trafficking and related criminal activity. On information and belief, the Wyndham Brand Defendants had been aware for years of numerous problems with problems in the hotels operated by Wyndham Franchisee.

## V. Defendants knew Jane Doe (T.S.) was being trafficked at the Subject Wyndham Hotels because of the apparent and obvious "red flags" of sex trafficking.

90.     Jane Doe (T.S.)'s traffickers used a common *modus operandi* when trafficking Jane Doe (T.S.) at their preferred hotels. This result in patterns of "red flags" that occurred across these hotels and should have been detected by a hotel exercising reasonable diligence.

91.     Jane Doe (T.S.)'s traffickers brought her to the Maplewood Days Inn on approximately four or five separate occasions in 2013. They typically kept her there for a few days and stayed as long as a week. She estimates she was trafficked at this location for a total of between 20 and 30 days.

92.     Jane Doe (T.S.)'s traffickers brought her to the St. Paul Super 8 repeatedly during her 2013 trafficking. She estimates that she was trafficked at this hotel between 20 and 30 days during 2013.

93.     Jane Doe (T.S.)'s traffickers brought her to the Brooklyn Center Super 8 repeatedly during her 2013 trafficking. She estimates that she was trafficked at this hotel between 20 and 30 days during 2013.

94.     During these stays at the Subject Wyndham Hotels, Jane Doe (T.S.) and her traffickers would interact with and be observed by members of the hotel staff, including the front desk staff and housekeeping staff. Jane Doe (T.S.) recalls that they would encounter the same staff members repeatedly.

95.     During the period that Jane Doe (T.S.) was trafficked at the Subject Wyndham Hotels, there were obvious signs that her traffickers were engaged in sex trafficking:

44

- The rooms where Jane Doe (T.S.) was trafficked were typically paid for using cash.

- Although Jane Doe (T.S.)'s traffickers would keep her at this hotel for days at a time, they would pay on a daily basis using cash earned from trafficking. When planning to stay, they would remain in the hotel room and only go to the front desk when someone knocked to tell them it was time to check out. They would then go to the front desk to pay for another night.

- Jane Doe (T.S.)'s traffickers forced her to dress provocatively. She would arrive and be in common areas of the hotel in clothes that were obviously inappropriate for her age and for the weather.

- Jane Doe (T.S.) would have few if any personal possessions with her at the Subject Wyndham Hotels, even for extended stays.

- Jane Doe (T.S.) was only 15 years old and appeared consistent with her age.

- Although she was and appeared like a high school student, she would routinely be present in the Subject Wyndham Hotels during regular school hours.

- Jane Doe (T.S.) frequently had visible bruising as a result of the beatings she experienced.

- Jane Doe (T.S.)'s traffickers would be present in the parking lot or common areas of the hotel monitoring Jane Doe (T.S.) while was with johns.

- Jane Doe (T.S.)'s traffickers frequently had one of their associates sit outside of the hotel room door while she was seeing johns, visibly monitoring her.

- There was a high volume of traffic to and from the hotel room where Jane Doe (T.S.) was staying as she was typically forced to see between 7 and 20 johns each day.

- The men coming to and from Jane Doe (T.S.)'s room were and appeared to be much older than her.

- The men would stay for short periods of time and come and go at unusual times.

- The Do Not Disturb sign was kept on the door constantly.

- When housekeeping knocked on the door to clean, Jane Doe (T.S.)'s traffickers would sometimes escort her out of the room and require her to stay in the car while the services were provided.

- When housekeeping provided services, there would be a high volume of sex paraphernalia, including condoms and wrappers, visible.

- When housekeeping provided services, there would often be blood on the towels or linens.

- When housekeeping provided services, there would be signs of drug use, including the smell of weed and signs of the cocaine her traffickers were using.

45

- Each day, Jane Doe (T.S.) or her traffickers would call down to the front desk to request additional extra towel and sheets. Sometimes they made multiple requests in a day.
- There would sometimes be altercations in the area outside the room where Jane Doe (T.S.) was being trafficked.
- Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

96.    Multiple employees at the Subject Wyndham Hotels, including management-level employees, observed or were made aware of these obvious signs of Jane Doe (T.S.)'s trafficking while acting within the scope and course of their employment.

97.    As such, Days Inn Franchisee knew or was willfully blind to the fact that Jane Doe (T.S.) was being trafficked at the Maplewood Days Inn, Super 8 Franchisee knew or was willfully blind to the fact that Jane Doe (T.S.) was being trafficked at the St. Paul Super 8 and SHI knew or was willfully blind to the fact that Jane Doe (T.S.) was being trafficked at the Brooklyn Center Super 8.

98.    Days Inn Franchisee also had constructive knowledge of the activity that resulted in the trafficking of Jane Doe (T.S.) at the Maplewood Days Inn because that activity was accompanied by such recognized "red flags" of sex trafficking that it was readily detectable through the exercise of ordinary diligence. If Days Inn Franchisee had exercised reasonable prudence in operating the Maplewood Days Inn, they would not have benefited from the illegal activities of Jane Doe (T.S.)'s traffickers at this hotel.

99.    Super 8 Franchisee also had constructive knowledge of the activity that resulted in the trafficking of Jane Doe (T.S.) at the St. Paul Super 8 because that activity was accompanied by such recognized "red flags" of sex trafficking that it was readily detectable through the exercise of ordinary diligence. If Super 8 Franchisee had exercised reasonable prudence in operating the St.

46

Paul Super 8, they would not have benefited from the illegal activities Jane Doe (T.S.)'s traffickers at this hotel.

100.    SHI also had constructive knowledge of the activity that resulted in the trafficking of Jane Doe (T.S.) at the Brooklyn Center Super 8 because that activity was accompanied by such recognized "red flags" of sex trafficking that it was readily detectable through the exercise of ordinary diligence. If SHI had exercised reasonable prudence in operating the Brooklyn Center Super 8, they would not have benefited from the illegal activities of Jane Doe (T.S.)'s traffickers at this hotel.

101.    The Wyndham Brand Defendants also knew or should have known about the trafficking of Jane Doe (T.S.) based on the numerous tools, described above, through which they monitored and supervised the Subject Wyndham Hotels.

102.    The Wyndham Brand Defendants also had constructive knowledge of the activity that resulted in the trafficking of Jane Doe (T.S.) at the Subject Wyndham Hotels because that activity was accompanied by such recognized "red flags" of sex trafficking that it was readily detectable through the exercise of ordinary diligence. If the Wyndham Brand Defendants had exercised ordinary prudence in areas of operations over which they retained control or in which they directly participated, they would have detected and stopped benefiting from the illegal activities of Jane Doe (T.S.)'s traffickers at the Subject Wyndham Hotels.

## VI.    Defendants actively facilitated sex trafficking at the Maplewood Days Inn, including the trafficking of Jane Doe (T.S.)

### A. Days Inn Franchisee facilitated the trafficking activity at the Maplewood Days Inn, including the trafficking of Jane Doe (T.S.)

103.    The Days Inn Franchisee harbored and facilitated the providing, maintenance, and exploitation of Jane Doe (T.S.) and other victims of Jane Doe (T.S.)'s traffickers at the Maplewood

Days Inn when it continued to provide rooms where they were imprisoned and exploited despite actual knowledge of or willful blindness to the fact that these victims were being trafficked at the Maplewood Days Inn.

104.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Maplewood Days Inn, Days Inn Franchisee continued renting rooms to be used in sex trafficking, providing traffickers with a safe heaven, and operating the Maplewood Days Inn in a way that enabled and facilitated sex trafficking activity.

105.    Although Days Inn Franchisee knew or should have known about the activity that resulted in Jane Doe (T.S.) being trafficked, Days Inn Franchisee continued to rent hotel rooms for and to facilitate that trafficking activity.

106.    Days Inn Franchisee also facilitated widespread trafficking at the Maplewood Days Inn, including the trafficking of Jane Doe (T.S.), in ways including:

    a. developing relationships with multiple traffickers, including Jane Doe (T.S.)'s traffickers, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

    b. maintaining an environment where criminal activity could occur without the need to make significant efforts to avoid detection;

    c. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of Jane Doe (T.S.) and other victims;

    d. observing Jane Doe (T.S.) in obvious distress but continuing to rent rooms that were used to traffic her;

    e. allowing johns who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking;

    f. providing excessive amounts of towels and linens that were used for the high volume of commercial sex that was occurring;

    g. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

48

h.  following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

i.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

j.  providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

107.    Days Inn Franchisee's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (T.S.)

108.    Days Inn Franchisee knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**B.  Super 8 Franchisee facilitated the trafficking activity at the St. Paul Super 8, including the trafficking of Jane Doe (T.S.)**

109.    Super 8 Franchisee harbored and facilitated the providing, maintenance, and exploitation of Jane Doe (T.S.) and other victims of Jane Doe (T.S.)'s traffickers at the St. Paul Super 8 when it continued to provide rooms where they were imprisoned and exploited despite actual knowledge of or willful blindness to the fact that these victims were being trafficked at the St. Paul Super 8.

110.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the St. Paul Super 8, Super 8 Franchisee continued renting rooms to be used in sex trafficking, providing traffickers with a safe heaven, and operating the St. Paul Super 8 in a way that enabled and facilitated sex trafficking activity.

111. Although Super 8 Franchisee knew or should have known about the activity that resulted in Jane Doe (T.S.) being trafficked, Super 8 Franchisee continued to rent hotel rooms for and to facilitate that trafficking activity.

112. Super 8 Franchisee also facilitated widespread trafficking at the St. Paul Super 8, including the trafficking of Jane Doe (T.S.), in ways including:

    a. developing relationships with multiple traffickers, including Jane Doe (T.S.)'s traffickers, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

    b. maintaining an environment where criminal activity could occur without the need to make significant efforts to avoid detection;

    c. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of Jane Doe (T.S.) and other victims;

    d. observing Jane Doe (T.S.) in obvious distress but continuing to rent rooms that were used to traffic her;

    e. allowing johns who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking;

    f. providing excessive amounts of towels and linens that were used for the high volume of commercial sex that was occurring;

    g. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

    h. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

    i. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

    j. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

113.    Super 8 Franchisee's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (T.S.)

114.    Super 8 Franchisee knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**C. SHI facilitated the trafficking activity at the Brooklyn Center Super 8, including the trafficking of Jane Doe (T.S.)**

115.    SHI harbored and facilitated the providing, maintenance, and exploitation of Jane Doe (T.S.) and other victims of Jane Doe (T.S.)'s traffickers at the Brooklyn Center Super 8 when it continued to provide rooms where they were imprisoned and exploited despite actual knowledge of or willful blindness to the fact that these victims were being trafficked at the Brooklyn Center Super 8.

116.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Brookly Center Super 8, SHI continued renting rooms to be used in sex trafficking, providing traffickers with a safe heaven, and operating the Brooklyn Center Super 8 in a way that enabled and facilitated sex trafficking activity.

117.    Although SHI knew or should have known about the activity that resulted in Jane Doe (T.S.) being trafficked, SHI continued to rent hotel rooms for and to facilitate that trafficking activity.

118.    SHI also facilitated widespread trafficking at the Brooklyn Center Super 8, including the trafficking of Jane Doe (T.S.), in ways including:

> k. developing relationships with multiple traffickers, including Jane Doe (T.S.)'s traffickers, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

51

l. maintaining an environment where criminal activity could occur without the need to make significant efforts to avoid detection;

m. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of Jane Doe (T.S.) and other victims;

n. observing Jane Doe (T.S.) in obvious distress but continuing to rent rooms that were used to traffic her;

o. allowing johns who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking;

p. providing excessive amounts of towels and linens that were used for the high volume of commercial sex that was occurring;

q. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

r. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

s. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

t. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

119. SHI's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (T.S.)

120. SHI knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**D. The Wyndham Brand Defendants facilitated the trafficking activity at the Subject Wyndham Hotels, including the trafficking of Jane Doe (T.S.)**

121.    The Wyndham Brand Defendants participated directly in aspects of the operation of the Subject Wyndham Hotels that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Jane Doe (T.S.), as follows:

a.  assuming joint responsibility with the franchisee for detecting and preventing sex trafficking at the hotel property;

b.  assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity;

c.  assuming or retaining control over and responsibility for training hotel staff on detecting and responding to sex trafficking based upon the well understood "red flags" or signs of sex trafficking;

d.  assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to sex trafficking;

e.  employing field-based associates who work with hotels on trafficking issues;

f.  assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g.  establishing systems for hotel staff and guests to report security issues to franchisor;

h.  requiring franchisees to provide Wi-Fi/internet access to guests;

i.  mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

j.  setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

k.  requiring franchisees to use a system to monitor and track housekeeping requests;

l.  setting policies for when and how housekeeping services are provided;

m.  collecting and monitoring data that shows patterns of use or non-use of housekeeping services;

n.   setting policies for when and how hotel staff can accept tips.

122.    The Wyndham Brand Defendants played a central role in renting rooms at the Subject Wyndham Hotels by, among other things:

a.   controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for guest reservation, check-in, and payment processes;

b.   controlling, overseeing and enforcing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

c.   requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

d.   reserving rooms and accept payments without requiring franchisee approval or involvement;

e.   controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

f.   requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

g.   requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

h.   requiring the franchisee to use a property-management system operated and controlled by the franchisor;

i.   requiring the franchisee to use a data-management system operated and controlled by the franchisor;

j.   ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

k.   exercising control over the price of rooms;

l.   controlling all details of the customer loyalty program that the franchisee was required to implement;

m.  setting detailed policies for the check-in process, including requirements for identification and payment methods;

54

n. collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

o. assuming sole ownership over all guest information;

p. overseeing do not rent (DNR) lists for its branded properties.

123. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Wyndham Hotels, Wyndham Brand Defendants continued renting rooms to traffickers pursuant to their venture, including the rooms used to sexually exploit Jane Doe (T.S.).

124. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Wyndham Hotels, including the activity that led to Jane Doe (T.S.)'s trafficking, the Wyndham Brand Defendants used their retained control over and direct involvement in hotel operations to facilitate trafficking, including by:

a. adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

b. adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

c. adopting and enforcing inadequate training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d. adopting and enforcing inadequate policies and protocols regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

e. providing traffickers continued access to Franchisor-maintained wi-fi and internet systems despite having active or constructive knowledge this access was being used to facilitate their trafficking activities;

f. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at the Maplewood Days Inn;

g. implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

125. The conduct of the Wyndham Brand Defendants in operating the Subject Wyndham Hotels facilitated widespread sex trafficking at these hotels, including the trafficking activities of Jane Doe (T.S.)'s traffickers. The specific ways that the Wyndham Brand Defendants facilitated sex trafficking at these hotels—including but not limited to their policies and practices that allowed for non-traceable payment methods, their policies and practices that allowed traffickers to rent rooms with providing their true identities, and their inadequate and inappropriate efforts at detection of and response to signs of sex trafficking—directly assisted and facilitated the activities of Jane Doe (T.S.)'s traffickers at this hotel and the trafficking of Jane Doe (T.S.).

126. Jane Doe (T.S.)'s traffickers were able to operate without interference and without making significant effort at a concealment during repeated visits to the Subject Wyndham Hotels over an extended period because the Wyndham Brand Defendants adopted, implemented, enforced, and used policies and practices that facilitated sex trafficking and minimized the risk of detection and traceability.

127. Although the Wyndham Brand Defendants knew or should have known that the Days Inn Franchisee and Super 8 Franchisee used their "boots on the ground" role at their respective hotels to facilitate sex trafficking, the Wyndham Brand Defendants facilitated, assisted, and supported these franchisees in continuing to do so. The Wyndham Brand Defendants had numerous tools and options available to respond to the ongoing facilitation of sex trafficking at the Subject Hotels, both through options for disciplining and controlling franchisees and through

56

their own ability to make relevant operational changes. Instead, the Wyndham Brand Defendants elected to continue lending the perceived legitimacy of their brand and its own direct operational involvement to a hotel that continued to operate in a way that facilitated widespread sex trafficking.

128. The Wyndham Brand Defendants' acts and omissions, which result from a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (T.S.).

129. The Wyndham Brand Defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

## VII.   Defendants' Ventures at the Subject Wyndham Hotels

130. Defendants benefited from use of their respective hotel(s) for sex trafficking. Jane Doe (T.S.)'s traffickers and other traffickers rented rooms at the Subject Wyndham Hotels and used these hotels to harbor, maintain, and provide victims including Jane Doe (T.S.). When these traffickers rented rooms, each Defendant received a financial benefit.

131. Days Inn Franchisee generated revenue every time a sex trafficker rented a room at the Maplewood Days Inn, both from room rental fees and from fees for other hotel services.

132. Super 8 Franchisee generated revenue every time a sex trafficker rented a room at the St. Paul Super 8, both from room rental fees and from fees for other hotel services.

133. SHI generated revenue every time a sex trafficker rented a room at the St. Paul Super 8, both from room rental fees and from fees for other hotel services.

134. Each of the Wyndham Brand Defendants generated substantial income from operation of the Subject Wyndham Hotels. In exchange for providing the services described above, each of the Wyndham Brand Defendants received a share of the revenue from room rentals

collected at these hotels. The fees generated by the Wyndham Brand Defendants are primarily based on gross room rentals; therefore, the Wyndham Brand Defendants' revenue increase with each room rental at these hotels. Revenue generated from rooms rented at these hotels was distributed among the Wyndham Brand Defendants, with each benefiting from every rental of a hotel room.

135.   The Wyndham Brand Defendants also benefited from sex traffickers' frequent use of the Subject Wyndham Hotels because this regular and routine use of the hotels increased the hotel occupancy rate, and an increase in the hotel occupancy rate resulted in several benefits for the Wyndham Brand Defendants, including that this assisted them in obtaining financing and helped them market franchising opportunities to potential franchisees.

136.   As more fully described above, the Wyndham Brand Defendants and Wyndham Franchisees knowingly benefited from participating in a venture with sex traffickers who regularly operated at the Subject Wyndham Hotels, including Jane Doe (T.S.)'s sex traffickers ("Venture 1").

137.   Both the Wyndham Brand Defendants and Wyndham Franchisees participated in this venture through a continuous business relationship with these sex traffickers. The traffickers developed a continuous business relationship with the Subject Wyndham Hotels, and both the Wyndham Brand Defendants and Wyndham Franchisees participated in this ongoing business relationship through their respective roles (as further described above) in operation of their respective hotel(s)v. This continuous business relationship involved mutual pursuit of benefit. These Defendants generated revenue from renting the rooms to traffickers who, in turn, used the rooms to generate revenue from the illegal sex trafficking operation. This continuous business relationship developed as:

a.  Wyndham Franchisees and the Wyndham Brand Defendants facilitated and enabled sex trafficking in the ways described above in Sections V-VI.

b.  Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties.

c.  These traffickers developed an understanding that hotel policies and practices would minimize their risk of detection and traceability.

d.  These traffickers developed an understanding that hotel staff would turn a blind eye and thus were able to operate without diverting time and resources to avoiding inference by hotel staff.

e.  These traffickers repeatedly returned to this same hotel because of an understanding that it was a venue that would enable and facilitate their sex trafficking operation.

138.    Wyndham Franchisees participated in the continuous business relationship with these traffickers through their direct "boots on the ground" role at their respective Subject Wyndham Hotels. As further described above in Section VI, the Wyndham Brand Defendants directly participated in this business relationship through their central role in room reservations and through their intimate involvement in aspects of hotel operations related to the detection of and response to sex trafficking.

139.    This continuous business relationship facilitated, assisted, and supported the traffickers' illegal sex trafficking activities, including their trafficking of Jane Doe (T.S.). The Wyndham Brand Defendants and Wyndham Franchisees did not only provide these traffickers with a physical space (harboring) but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation without significant risk of disruption by hotel staff and with minimal risk of detection and traceability. The Wyndham Brand Defendants and Wyndham Franchisees also allowed johns who were not registered hotel guests to come and go freely without any need to identify themselves. This helped the traffickers to attract business from sex buyers and

to minimize risks of detection and traceability. The conduct of both the Wyndham Franchisees and Wyndham Brand Defendants facilitated trafficking at the Subject Wyndham Hotels.

140. The Wyndham Brand Defendants and Wyndham Franchisees knew or should have known that Venture 1 was engaged in violations of the TVPRA because victims were being harbored, maintained, provided, and exploited at the Subject Wyndham Hotels by traffickers including Jane Doe (T.S.)'s traffickers.

141. In ways described more fully above, the Wyndham Brand Defendant and Wyndham Franchisees also knowingly benefited from participating together in a hotel-operating venture at the Subject Wyndham Hotels that facilitated widespread sex trafficking, including the trafficking of Jane Doe (T.S.) (hereinafter "Venture 2").

142. Venture 2 is a commercial venture that resulted from a longstanding business relationship between each of the Wyndham Franchisees and the Wyndham Brand Defendants that centered on operation of their respective Subject Wyndham Hotels. This undertaking involved shared goals of maximizing gross room revenue and increasing room occupancy rates.

143. Wyndham Franchisees and the Wyndham Brand Defendants each participated in Venture 2 through their respective roles in hotel operations as further described above in in Sections V-VI. Each of these Defendants was directly involved in aspects of operations that facilitated sex trafficking at the hotel and continued to operate the hotel in the same manner despite actual or constructive knowledge that this was facilitating sex trafficking.

144. There were TVPRA violations within the scope of Venture 2 because the hotels at the center of the venture, the Subject Wyndham Hotels, were used to harbor, maintain, provide, and exploit many trafficking victims, including multiple victims of Jane Doe (T.S.)'s traffickers

and Jane Doe (T.S.) herself. There were also TVPRA violations with the scope of Venture 2 through Wyndham Franchisees's violations of 18 U.S.C. §1591(a) as perpetrators.

145. Both Wyndham Franchisees and the Wyndham Brand Defendants knew or should have known that there were TVPRA violations within the scope of Venture 2 based on the obvious "red flags" associated with the trafficking activities of Jane Doe (T.S.)'s traffickers and other traffickers at the Subject Wyndham Hotels.

146. The Wyndham Brand Defendants also knew or should have known that there were TVPRA violations within the scope of Venture 2 based on the role of Wyndham Franchisees in facilitating widespread sex trafficking, including by Jane Doe (T.S.)'s traffickers as further described in in Section V. Despite this, the Wyndham Brand Defendants continued to assist and facilitate these violations through their ongoing participation in this commercial venture with Wyndham Franchisees.

## VIII. Wyndham Franchisees and the Staff at the Subject Wyndham Hotels Acted as Actual Agents of the Wyndham Brand Defendants.

147. The Wyndham Brand Defendants are vicariously liable for the acts, omissions, and knowledge of Wyndham Franchisees and hotel staff, which acted as the Wyndham Brand Defendants' agents or subagents when operating the Subject Wyndham Hotels.

148. The Wyndham Brand Defendants subjected and retained the right to subject the Wyndham Franchisees to detailed requirements regarding the operation of the Subject Wyndham Hotels. These detailed requirements came from written agreements, manuals, policies, protocols, directives, and mandates that the Wyndham Brand Defendants imposed through their ongoing control of hotel operations.

149. The Wyndham Brand Defendants obscure the full extent of control they exercise over the Wyndham Franchisees by treating these manual, policies, and directives as confidential

61

and proprietary and guarding against public disclosure. Upon information and belief, the requirements that that the Wyndham Brand Defendants imposed on the Wyndham Franchisees:

a. Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Wyndham Franchisees used at the Subject Wyndham Hotels, such as telling hotel staff step-by-step how to perform tasks at the hotel and mandating that Wyndham Franchisees Franchises use tools and products selected and controlled by the Wyndham Brand Defendants.

b. Covered virtually all aspects of hotel operations, including internal operating functions, such as human-resources issues and accounting and finance practices.

c. Dictated the specific ways that Wyndham Franchisees and hotel staff were required to carry out day-to-day functions.

d. Required the use of Wyndham Brand Defendants' owned, operated and controlled reservation and operation systems software and hardware.

e. Significantly exceeded what was necessary for the Wyndham Brand Defendants to protect their trademarks.

150. In addition to the ways described above, upon information and belief, Wyndham Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over Wyndham Franchisees' day-to-day operation of the Subject Wyndham Hotels, including the following ways:

a. Wyndham Brand Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham to protect its registered trademarks;

b. Wyndham Brand Defendants maintained a team of regionally based trainers to provide training at branded hotels. Wyndham provided training for hotel management and select hotel staff on-site and at locations selected by Wyndham;

c. Wyndham Brand Defendants provided hotels staff with training it created through an online learning platform, Wyndham University, it controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

62

d. Wyndham Brand Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. Wyndham Brand Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. Wyndham Brand Defendants participated in the hiring, disciplining, and terminating hotel management and employees;

g. Wyndham Brand Defendants required franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

h. For certain products and services that franchisee was required to purchase to operate the property, Wyndham Brand Defendants designated approved vendors and prohibited franchisee from purchasing goods and services from anyone other than an approved vendor;

i. Wyndham Brand Defendants required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations of the hotel through direct access to the system;

j. The Wyndham Brand Defendants set and controlled room rates and discounts;

k. Wyndham Brand Defendants set required staffing levels for the Subject Wyndham Hotels;

l. Wyndham Brand Defendants established job requirements for positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

m. Wyndham Brand Defendants set requirements for and oversaw the hiring, employee discipline, and termination processes used by franchisees;

n. Wyndham Brand Defendants controlled channels for guests to report complaints or provide feedback regarding the Subject Wyndham Hotels and directly participated in the response and/or supervised and the response to customer complaints or other feedback. Wyndham retained the right to provide refunds or other compensation to guests and to require Wyndham Franchisees to pay associated costs;

o. Wyndham Brand Defendants generated reports and analysis of guest complaints and online reviews for the Subject Wyndham Hotels;

p. Wyndham Brand Defendants set detailed requirements for insurance that Wyndham Franchisees must purchase;

q. Wyndham Brand Defendants exercised or retained control over the franchisee's accounting and banking practices;

r. Wyndham Brand Defendants regularly audited the books and records of Wyndham Franchisees;

s. Wyndham Brand Defendants conducted frequent and unscheduled inspections of the Subject Wyndham Hotels;

t. Wyndham Brand Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if franchisee violated any of Wyndham' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Subject Wyndham Hotels;

u. Wyndham Brand Defendants controlled all marketing for the Subject Wyndham Hotels, directly provided marketing services, and prohibited Wyndham Franchisees from maintaining any online presence unless specifically reviewed and approved by Wyndham;

v. Wyndham Brand Defendants exercised or retained control over all aspects of building and facility design;

w. Wyndham Brand Defendants imposed detailed recordkeeping and reporting requirements on Wyndham Franchisees regarding virtually all aspects of hotel operations;

x. Wyndham Brand Defendants supervised and controlled day-to-day operations of the Subject Wyndham Hotels through detailed information and extensive reports that it obtained through the property management system and other software systems it required Wyndham Franchisees to use;

y. Wyndham Brand Defendants required the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis; and

z. Wyndham Brand Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

151. As further described above in in Section VI, the Wyndham Brand Defendants specifically retained and exercised control over the aspects of hotel operations at the Subject

Wyndham Hotels that caused or contributed to Jane Doe (T.S.)'s harm, including but not limited to: reservations of rooms, relevant policies (including payment method accepted, identification requirements, and hotel access for individuals who are not registered hotel guests) hotel security, employee training, guest and hotel staff reporting of security issues, and detection of and response to suspected sex trafficking. The Wyndham Brand Defendants had the right to exercise detailed, day-to-day control over and involvement in these areas. They also regularly and closely monitored these areas.

152.   The Wyndham Brand Defendants had the right to and did enforce control over Wyndham Franchisees through various methods, including:

    a.   the right to conduct detailed inspections of the Subject Wyndham Hotels;

    b.   monitoring or auditing the Wyndham Franchisees for compliance with policies and expectations;

    c.   directing Wyndham Franchisees to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

    d.   mandating training and education for franchisees and/or hotel staff;

    e.   employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

    f.   the right to impose fines or penalties;

    g.   the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services; and

    h.   the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

**IX.   Wyndham Brand Defendants are jointly responsible for the trafficking of Jane Doe (T.S.) at the Subject Wyndham Hotels.**

153. WHR is responsible, as a successor, for the acts and omissions of its predecessors (including Wyndham Worldwide Corporation and its subsidiaries) with respect to operation, franchising, and control of the Subject Wyndham Hotels.

154. Prior to 2018, an entity known as Wyndham Hotels and Resorts was a private company (referred to herein as "predecessor WHR") that was a wholly owned subsidiary of Wyndham Worldwide Corporation. In 2018, Wyndham Worldwide Corporation approved a spin-off of its wholly owned subsidiary, predecessor WHR, to form a public company for the continued operation of the Wyndham hotel business that had previously been conducted by Wyndham Worldwide Corporation and/or its wholly owned subsidiaries. This business included the franchising, control, and operation of the Subject Wyndham Hotels. This public company that resulted from this spin-off was Defendant WHR.

155. Defendant WHR and its wholly owned subsidiaries continued to operate all or substantially all the hotel business formerly operated by Wyndham Worldwide Corporation and its subsidiaries, including the franchising, control, and operation of the Subject Wyndham Hotels.

156. Upon information and belief, WHR agreed to assume responsibility for liabilities of Wyndham Worldwide Corporation and its former subsidiaries regarding the franchising, control, and operation of the Subject Wyndham Hotels.

157. Upon information and belief, the rights and obligations regarding the operation, franchising, and control of the Subject Wyndham Hotels were shared and fulfilled jointly by the Wyndham Brand Defendants. Upon information and belief, each of the Wyndham Brand Defendants shared revenue related to operation, franchising, and control of the Subject Wyndham Hotels, and each of the Wyndham Brand Defendants experienced a direct benefit from the rental

of rooms to traffickers at the Maplewood Days Inn, St. Paul Super 8 and Brooklyn Center Super 8.

158.    Upon information and belief, each of the Wyndham Brand Defendants participated in a joint venture or integrated enterprise with one another regarding the operation, control, and franchising of the Subject Wyndham Hotels. The Wyndham Brand Defendants, who were corporate affiliates subject to common ownership and control, were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management. They shared office space, employees, management, and policies. Thus, the Wyndham Brand Defendants are vicariously liable for the actions of one another with regard to the operation, franchising, and control of the Subject Wyndham Hotels.

159.    Upon information and belief, operation of the Subject Wyndham Hotels was part of a single unified operation by Wyndham Brand Defendants. Upon information and belief, all Wyndham Brand Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, Wyndham Brand Defendants acted jointly to own, operate, control, manage, and supervise the Subject Wyndham Hotels. As an integrated enterprise and/or joint venture, Wyndham Brand Defendants were separately and jointly responsible for compliance with all applicable laws.

## CAUSES OF ACTION

160.    Jane Doe (T.S.) incorporates all other allegations.

## I.    Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Days Inn Franchisee)

161.    Jane Doe (T.S.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

162. Days Inn Franchisee, SHI and Super 8 Franchisee are perpetrators within the meaning of 18 U.S.C §1595(a) because each:

    a. knew about or was willfully blind to trafficking at their respective hotel, including the activity leading to Jane Doe (T.S.)'s trafficking because they directly observed the obvious "red flags" of this trafficking activity;

    b. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe (T.S.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at their respective hotel properties.

    c. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that trafficked victims including Jane Doe (T.S.).

## II. Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).

163. Jane Doe (T.S.) is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C. §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

164. All Defendants are liable as beneficiaries under 18 U.S.C. § 1595(a).

165. **Venture 1:** Through acts and omissions more fully described throughout this Amended Complaint, the Wyndham Brand Defendants and the Wyndham Franchisees received a financial benefit from participating in a venture with Jane Doe (T.S.)'s sex traffickers and other traffickers who regularly operated at their respective hotel(s).

    a. Venture 1 resulted from the development of a continuous business relationship between these traffickers and the Subject Wyndham Hotels, which formed when the Wyndham Brand Defendants and Wyndham Franchisees continued renting these traffickers hotel rooms despite the obvious "red flags" of their sex trafficking

activity and created an environment at their respective hotel(s) that facilitated their trafficking activities.

b. The Wyndham Brand Defendants and Wyndham Franchisees each directly participated in this ongoing business relationship through their respective roles in hotel operations—and specifically those aspects of operations that facilitated sex trafficking—as described above. Through their participation, the Wyndham Brand Defendants and Wyndham Franchisees facilitated and supported the activities of sex traffickers of Jane Doe (T.S.) and other traffickers at their respective hotel(s).

c. The Wyndham Brand Defendants and Wyndham Franchisees benefited from this their participation in this venture because they received increased revenue and other benefits described above when rooms at their respective hotel(s) were rented to traffickers, including Jane Doe (T.S.)'s traffickers.

d. This venture violated the TVPRA through the conduct of the traffickers who repeatedly harbored, maintained, provided, and exploited victims, including Jane Doe (T.S.), at the Subject Wyndham Hotels.

e. The Wyndham Brand Defendants and Wyndham Franchisees knew or should have known that Venture 1 was engaged in violations of the TVPRA based on the "red flags" associated with the illegal activities of Jane Doe (T.S.)'s traffickers and other traffickers regularly operating at their respective hotel(s) and because this trafficking would have been detected if they had exercised ordinary prudence.

166.     **Venture 2**: Through the acts and omissions more fully described above, the Wyndham Brand Defendants and Wyndham Franchisees also participated together in a commercial hotel-operating venture that facilitated widespread sex trafficking at the Subject Wyndham Hotels:

a. Venture 2 is a commercial venture that resulted from the business relationship between the Wyndham Brand Defendants and Wyndham Franchisees operating the their respective hotel(s) for the mutual purpose of maximizing revenue, including gross room revenue.

b. Wyndham Franchisees participated in this venture by using their on-the-ground role to operate their respective hotel in a way that they knew or should have known was facilitating sex trafficking.

c. The Wyndham Brand Defendants participated in this venture by (1) continuing the ongoing business relationship with Wyndham Franchisees despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel in ways described above; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

d. The Wyndham Brand Defendants and Wyndham Franchisees all benefited from participating in Venture 2 as each derived revenue and other benefits from each room rented to a sex trafficker a their respective hotel(s), including the rooms rented to the traffickers of Jane Doe (T.S.).

e. Venture 2 violated the TVPRA through the widespread sex trafficking that occurred at the Subject Wyndham Hotels as victims—including Jane Doe (T.S.)—were harbored, maintained, provided, and exploited at the Subject Wyndham Hotels. This venture also violated the TVPRA through the conduct of Franchisees, who violated 18 U.S.C. §1591(a) as perpetrators.

f. The Wyndham Brand Defendants and Wyndham Franchisees knew or should have known that this hotel-operating venture was facilitating sex trafficking, including the activities of the traffickers of Jane Doe (T.S.).

## III.    Cause of Action: Liability under 18 U.S.C. § 2255

167. While a minor, Jane Doe (T.S.) was a victim under 18 U.S.C. §1591 and is thus entitled to bring a civil action under 18 U.S.C. § 2255.

168. Days Inn Franchisee, SHI and Super 8 Franchisee are liable to Plaintiff under 18 U.S.C. § 2255 because, as alleged above, each is a perpetrator under 18 U.S.C. §1591.

169. Each of the Defendants is liable to Jane Doe (T.S.) under 18 U.S.C. § 2255 because, as alleged above, each Defendant is liable as a beneficiary under 18 U.S.C. §1595(a).

## IV.    Cause of Action: Vicarious Liability for TVPRA Violations (The Wyndham Brand Defendants).

170. The Wyndham Brand Defendants are vicariously liable for the TVPRA violations of the Wyndham Franchisees and hotel staff, who acted as the Wyndham Brand Defendants' actual agents.

70

171.    An agency relationship existed between the Wyndham Brand Defendants and Wyndham Franchisees because, through the acts and omissions described more fully above, the Wyndham Brand Defendants exercised and retained the right to exercise pervasive control over Wyndham Franchisees and their operation of the Subject Wyndham Hotels, including the means and methods they used and their day-to-day operations of the hotels.

172.    An agency relationship also existed between the Wyndham Brand Defendants and Wyndham Franchisees because the Wyndham Brand Defendants retained and exercised control over the specific aspects of operations that caused Jane Doe (T.S.)'s harm as described above.

173.    Wyndham Franchisees committed TVPRA violations—as both beneficiaries and perpetrators—and violations of 18 U.S.C. § 2255 within the scope of their agency relationship with the Wyndham Brand Defendants. Specifically, they committed these violations while renting rooms at their respective hotel and operating that hotel in a manner that facilitated sex trafficking.

174.    Jane Doe (T.S.) further alleges that the Wyndham Brand Defendants are vicariously liable for the acts and omissions of the staff at the Subject Wyndham Hotels as a joint employer. In the ways described throughout this Amended Complaint, the Wyndham Brand Defendants jointly controlled the terms and conditions of their employment. As a result, the Wyndham Brand Defendants and Wyndham Franchisees are the joint employers of the hotel staff.

175.    Moreover, each of the Wyndham Brand Defendants is liable for the acts and omissions of the other Wyndham Brand Defendants with respect to the operation and franchising of the Subject Wyndham Hotels. On information and belief, the Wyndham Brand Defendants, who were corporate affiliates subject to common ownership and control and who shared employees and a single corporate headquarters, operated as a joint venture engaged in profit sharing and subject to mutual control regarding the operation of the Subject Wyndham Hotels. They operated as a

71

single integrated enterprise and as alter-egos and/or agents of one another with respect to operation of the Subject Wyndham Hotels, making them vicariously liable for one another.

## DAMAGES

176.    Jane Doe (T.S.) sustained legal damages as a result of being the victim of sex trafficking under the TVPRA.

177.    Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (T.S.).

178.    Jane Doe (T.S.) is entitled to be compensated for personal injuries and economic damages, including:

    a.    Actual damages (until trial and in the future)

    b.    Incidental and consequential damages (until trial and in the future);

    c.    Mental anguish and emotional distress damages (until trial and in the future);

    d.    Lost earnings and lost earning capacity (until trial and in the future);

    e.    Necessary medical expenses (until trial and in the future);

    f.    Life care expenses (until trial and in the future);

    g.    Physical pain and suffering (until trial and in the future);

    h.    Physical impairment (until trial and in the future);

    i.    Emotional impairment (until trial and in the future);

    j.    Exemplary/Punitive damages;

    k.    Attorneys' fees; and

    l.    Costs of this action.

    m.    Pre-judgment and all other interest recoverable.

## JURY TRIAL

179.    Jane Doe (T.S.) demands a jury trial on all issues.

## RELIEF SOUGHT

180.    WHEREFORE, Jane Doe (T.S.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (T.S.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (T.S.) may, in law or in equity, show herself to be justly entitled

Dated:  April 1, 2026

Respectfully submitted,

**SIEBEN CAREY, P.A.**


By:  */s/Jeffrey M. Montpetit*
    JEFFREY M. MONTPETIT (#0291249)
    901 Marquette Avenue, Ste. 500
    Minneapolis, MN 55402
    Phone:  612/333-9762
    jeffrey.montpetit@knowyourrights.com


**PROVOST ★ UMPHREY LAW FIRM**

BRYAN O. BLEVINS (Admitted *Pro hac vice*)
COLIN MOORE (Admitted *Pro hac vice*)
350 Pine Street, Ste. 1100
Beaumont, TX 77701
Phone:  409/838-8881
Fax:  409/813-8630
dbrown@pulf.com
mmatheny@pulf.com


**ANNIE MCADAMS, PC**

ANNIE MCADAMS (TX SBN 24051014)
1150 Bissonnet
Houston, TX 77005
Phone:  713/785-6262
Fax:  866/713-6141
annie@mcadamspc.com